HADSELL STORMER RICHARDSON & RENICK, LLP
DAN STORMER   SBN 101967
LINCOLN ELLIS   SBN 283657
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t.  626 585-9600 f.  626 577-7079
e. dstormer@hadsellstormer.com
e. l.ellis@hadsellstormer.com

BARRETT S. LITT  SBN 45527
KAYE, McLANE, BEDNARSKI & LITT
234 E. Colorado Boulevard, Suite 230
Pasadena, CA 91101
t. 626 844-7660 f. 626 844-7670
e. blitt@kmbllaw.com

SCHONBRUN, DE SIMONE, SEPLOW, HARRIS,
    HOFFMAN & HARRISON
PAUL HOFFMAN   SBN 71244
CATHERINE SWEETSER   SBN 271142
732 Ocean Front Walk
Venice, CA 90291
t. 310 396-0731   f. 310 399-7040
e. hoffpaul@aol.com
e. catherine.sdshhh@gmail.com

LAW OFFICE OF CAROL A. SOBEL    LAW OFFICE OF COLLEEN FLYNN
CAROL A. SOBEL SBN 84483            COLLEEN M. FLYNN SBN 234281
3110 Main Street, Suite 210        3435 Wilshire Boulevard, Suite.2910
Santa Monica, CA 90405                  Los Angeles, CA 90010
t. 310 393-3055   f. 310 451-3858    t. 213 252-9444   f. 213 252-0091
e. carolsobel@aol.com              e. cflynnlaw@yahoo.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| CHERYL AICHELE, JONATHAN ALEXANDER, CARINA CLEMENTE, MICHAEL PRSYNER, JAMES WEITZ, individually and as class representatives;<br><br>          Plaintiffs,<br><br>CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, MAYOR ANTONIO VILLARAIGOSA, CHIEF CHARLIE BECK, individually and in their official capacities, DOES 1-100;<br><br>          Defendants. | CASE NO:<br><br>CLASS ACTION FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; JURY DEMAND<br><br>CIVIL RIGHTS:<br><br>42 U.S.C §1983:<br>FIRST AMENDMENT<br>FOURTH AMENDMENT<br>FOURTEENTH AMENDMENT<br><br>CALIF. CONSTITUTION, ARTICLE I, §§2,3,7,13<br>CA CIVIL CODE §52.1<br>FALSE ARREST<br>NEGLIGENCE |

**JURISDICTION AND VENUE**

1.    This action arises from under 42 U.S.C. §1983.  The Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §§1331 and 1343.  The Court has jurisdiction over the class-action claims pursuant to 28 U.S.C. § 1332(d)(2).  Supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.  The Court has jurisdiction to issue declaratory and/or injunctive relief pursuant to 28 U.S.C. §§2201 and 2202 and Federal Rules of Civil Procedure 57.

2.    Venue is proper in the Central District as the injuries complained of occurred in the City of Los Angeles ("City") and were caused by the Los Angeles Police Department ("LAPD") and the Los Angeles County Sheriff's Department ("LASD").  In addition, all defendants are located within the Central District Western Division.

**STATEMENT OF FACTS**

3.    This is a civil rights action arising from the unconstitutional and unlawful violation of plaintiffs' First, Fourth and Fourteenth Amendment rights to assembly, association, freedom from unlawful seizure and liberty.  Plaintiffs, and the class of similarly situated individuals whom they represent, were among approximately 300 peaceable protestors and bystanders arrested on November 30, 2011 by the City defendants at or in the vicinity of Los Angeles City Hall in a massive, but unlawful, plan to end Occupy Los Angeles.

**The Historical Use of City Hall as a Quintessential Public Forum**

4.    The lawn and steps of Los Angeles City Hall have historically been the primary gathering point in the City to engage in protest and petition activities on a myriad of issues, and have been treated as, and considered to be, archetypal public fora and gathering places by both the public and the City of Los Angeles and its officials.  For example, in 1990, more than a thousand anti-abortion demonstrators

protested on the South steps of City Hall, with a large number of counter-protestors also present. Well over more than 5,000 people gathered in the same location to protest the first Gulf War. The immigrant rights marches and rallies of the last decade similarly brought tens of thousands of people to City Hall lawn, spilling over into the surrounding streets. The largest group assembled was in 2006, where the Los Angeles Police Department estimated that ~~as~~ more than 750,000 gathered to protest the proposed immigration bill by Representative Sensenbrenner, and listened to speakers standing on the steps of City Hall. More recently, several thousand counter-demonstrators assembled on City Hall lawn to protest a neo-Nazi rally being held on the south steps.

**The History of Occupy Los Angeles' Use of the City Hall Forum**

5.   Plaintiffs participating in the Occupy Los Angeles protest first assembled on the south lawn at City Hall on October 1, 2011. City Hall is the iconic symbol of government in Los Angeles and a quintessential public forum where the community has historically assembled to exercise First Amendment rights. On that first night and for several subsequent nights, after long discussions with City officials, Occupy participants were required to move their tents off the City Hall lawn at night. But, within just a few days, the City no longer imposed that requirement and permitted the tents to stay up in plain view around the clock. That situation of Occupy participants remaining in tents on the City Hall lawn remained continuously until November 30, 2011.

6.   Plaintiffs maintained tents in round-the-clock vigils at City Hall to symbolize the economic crisis that has resulted in historic levels of foreclosures of homes, while financial institutions benefit from public bail outs. At the outset, City officials gave their full endorsement to the protest. In the first week of the demonstration, then-Council President Eric Garcetti and Councilmembers Rosendahl, Alarcon and Zine visited the Occupy protest. Several of the councilmembers expressly stated their support for the protest. In that first week,

Councilmembers Rosendahl and Alarcon introduced a formal resolution of support for the Occupy protest. The final version of the resolution was passed in mid-October, 2011. Under the City Administrative Code, the Mayor had the opportunity to veto the resolution but expressly decided not to do so. At every instance, City officials communicated to plaintiffs that they had permission to be present at City Hall lawn and engage in their round-the-clock vigil against economic injustices.

7. On or about October 6, 2011, Mayor Villaraigosa brought tarps to the demonstrators to protect them from the rain. Over the first several weeks of their demonstration, City officials passed a formal resolution of support for the Occupy action. In every respect, both explicit and implicit, City officials provided nothing except public approval for the Occupy assembly and recognition of its lawfulness. The resolution, passed unanimously by the City Council, expressly stated that "the City of Los Angeles hereby stands in SUPPORT for the continuation of the peaceful and vibrant exercise in First Amendment Rights carried out by Occupy Los Angeles ..." This was a reference to the ongoing 24-hour round-the -clock protest that had been under way for nearly two weeks as of the time (October 12, 2011) the Resolution was adopted by the Council.

**The Lack of a Constitutionally Sufficient Waiver Process for Use of the Forum**

8. At the time that Occupy began its expressive activities at City Hall lawn, the City had no, or inadequate, standards to guide the exercise of discretion by public employees regarding use of this quintessential public forum. The City had no procedures to obtain a waiver of time, place or manner restrictions on public assemblies on City Hall lawn. The City had no procedures by which to rescind approval - explicit or implied - for the Occupy demonstration at City Hall lawn. Moreover, the City never raised nor imposed any permitting requirements on Occupy. 9. In the 1980s, permission to assemble on City Hall lawn was approved by the Mayor's office through an informal process. When the Pope was scheduled to visit Los Angeles in the late 1980s, the same process was followed and

permission was granted to the "Greet the Pope" coalition - a coalition of LGBT, pro-choice and other activists - to assemble at City Hall lawn. Then =Asst. Chief Vernon sought to ban the protest, but was overridden by the Mayor and the City Council. In the wake of the protests following the state criminal acquittal of the officers in the Rodney King beating case, the LAPD again attempted, unilaterally, to ban protests at City Hall lawn. The LAPD was unsuccessful and the forum remained open to protest with no formal permitting process. In fact, in the past even LAPD officers gathered, without a permit, at this site to protest stalled contract negotiations with the City. After the litigation against the City resulting from police assaults on demonstrators at the Democratic National Convention in 2000, a new permitting process was implemented, consolidating the process in the Los Angeles Police Department. Over the course of more than three decades, the public fora surrounding the City Hall were never identified as public park grounds, never subject to permitting regulations applicable to City parks, and never under the purview of the Department of Recreation and Parks. The Municipal Code provisions regulating expressive activity in the City's public parks is even more constitutionally deficient than the City's other permitting process for expressive activity in streets and on sidewalks. The waiver process in the park regulations is totally illusory and capricious. There is no constitutionally adequate process for approving a waiver or revoking one once given.

10.   Because the City Hall lawn is a quintessential public forum, any decision regarding the use of this location for expressive activity must be made pursuant to narrow, objective, and fixed standards. Consistent with this bedrock principle, the government may not enact new restrictions or enforce previously unenforced restrictions in such fora to respond to a particular speaker. To pass constitutional muster, any time, place and manner restrictions on use of the particular forum must be codified in objective criteria set out in advance of a specific protest.

**The Use of Tents as Expressive Activity**

11.    Plaintiffs set up tents as an expression of their message opposing economic inequality, bailouts for Wall Street and foreclosures for "Main Street". Initially, at the direction of the City defendants, plaintiffs moved their tents to the public sidewalks late each night, where they slept until morning.  After a short time, plaintiffs were allowed to remain with their tents on the lawn at night.  At the time that the participants in Occupy assembled on the City Hall lawn, the forum had never been posted with any notice that it was a "park" and the City had never treated it as such.

12.    At the time that the participants in Occupy assembled on the City Hall lawn, the only restriction in the Los Angeles Municipal Code ("LAMC") on "camping" was set forth in LAMC 63.44(c) and limited to beach property and those areas posted as parks.  Only months   after plaintiffs were unlawfully arrested did the City amend the Municipal Code for the specific purpose of identifying City Hall lawn as a "park" in which "camping" was prohibited.  In the late spring of 2012, the City Attorney drafted an amendment to Los Angeles Municipal Code §63.44 (prohibiting camping and tents in public parks), which was not adopted by the City Council until six months <u>after</u> plaintiffs were arrested.  Accordingly, on November 30, 2011, the City had no legal basis or authority to treat City Hall lawn as a park or subject to camping restrictions.

**The Meetings With City Officials**

13.    Throughout the time that Occupy was present at City Hall lawn, the participants repeatedly met with City officials to address any concerns the City had about the demonstration.  On several occasions, the City asked the County Health Department to inspect the protest area. Occupy immediately addressed any concerns raised by the County Health Department and complied fully to alleviate any potential problems.  For example, when the County Health Department expressed concern that the portable toilets were inadequate to serve the number of participants

in Occupy, the group immediately provided clean toilets on a more frequent basis. At no time was Occupy notified that their presence at City Hall lawn constituted a public health crisis or that their presence presented any other emergency requiring their immediate dispersal.

14.     At the press conference <u>after</u> plaintiffs were arrested, Mayor Villaraigosa made fleeting reference to the presence of children at the protest site as a reason to move against plaintiffs, but there were few, if any, children present at any time and the situation regarding the presence of children, to the extent it existed at all, was no different on or around November 30 than at any other time. No children were present when the City launched its "shock and awe" attack on plaintiffs, in which 1400 LAPD officers executed a deliberate plan to remove and arrest plaintiffs.  No children were present when this plan was executed and no children were taken into custody by public officials charged with protecting the welfare of children.  Moreover, Los Angeles has homeless families living on the streets and in cars with young children on and around Skid Row, but the Mayor has never responded to that situation or indicated that City action was necessary to address it.

**The Removal of Occupy Los Angeles by Executive Fiat and "Shock and Awe"**

15.     On Friday, November 25, 2011, plaintiffs learned by watching a press conference held by defendants that they would no longer be allowed to engage in the same expressive activities at City Hall that they had engaged in with the full knowledge and approval of City officials for the past eight plus weeks.  There was no process by which this decision was made other than executive fiat.  Shortly after that press conference, City employees tacked paper signs to trees, announcing that the area was now subject to closure at night under the City's park regulations. Plaintiffs were ordered to leave the forum where they had assembled peaceably with approval of the City Council for 59 days.

16.     So, after two months, defendant City, through the Mayor and the

7

LAPD, developed and executed a plan to eject plaintiffs from City Hall lawn, which involved an unprecedented show of force by the LAPD.  In the words of Chief Beck, the aim of the LAPD was to utilize  "shock and awe," a militaristic approach made infamous by former Secretary of Defense Donald Rumsfeld in the 2003 invasion and bombing of Iraq in search of elusive "weapons of mass destruction."  The only weapon plaintiffs had in this instance was the First Amendment.

17.    The City defendants began execution of their campaign of "shock and awe" at approximately 12:00 a.m. on November 30, attacking from all sides with one group of officers bursting out of the doors of City Hall and knocking down anyone in their path.  As officers prepared to make arrests, they advised that anyone who did not want to be arrested should leave City Hall lawn and stand in a particular place identified by the officers.  But when some of the plaintiffs followed those orders, they were "kettled" by other officers and arrested, despite the fact that they had fully complied with the order to disperse.  In addition, officers indiscriminately arrested individuals who were several blocks from the "shock and awe" target, including individuals who had not been present for a dispersal order.

**The Arrests and Detention Conditions**

18.    Following their arrests, plaintiffs were transported to the LAPD's Metropolitan Detention Center ("MDC") or the Van Nuys jail.  Those taken to the MDC were held in tight handcuffs in a parking structure adjacent to the jail.  They were kept there for hours and denied access to bathroom facilities and water.  Their requests to loosen their handcuffs were ignored.  Their requests to use bathroom facilities were similarly denied, with male arrestees told they could do so if they could urinate with their hands handcuffed behind their backs. Those plaintiffs transported to Van Nuys jail were held on buses for approximately 7 hours, with no access to bathroom facilities or water, tightly handcuffed the entire time.  Their requests to loosen their handcuffs were also ignored.  In response to requests to use bathroom facilities, they were told to urinate and defecate on themselves, which

1 some were forced to do.

2       19.    The majority of plaintiffs were incarcerated for approximately 60 hours,

3 despite the fact that they were entitled to release on their own recognizance ("OR")

4 pursuant to California Penal Code §853.6.  This statute requires, in mandatory

5 language, that law enforcement release misdemeanor arrestees, such as plaintiffs, on

6 their own recognizance either prior to, or immediately after, booking unless one of

7 a limited number of exceptions applies.   There was no reasonable basis to believe

8 that each and every one of the plaintiff class came within any of these enumerated

9 exceptions, and no individualized assessment of whether an arrestee fit an exception

10 was made.  While most of the class was incarcerated unlawfully for more than 60

11 hours, others were forced to post the maximum cash bail for a misdemeanor offense

12 in order to gain their release.   Others who did not have the personal financial

13 resources to post a full cash bail posted a lesser bond, which was nonrecoverable.

14 In sum, the entire plaintiff class was denied the individualized assessment of

15 criminal liability that is the hallmark of due process and each had their liberty

16 unlawfully restricted as a result of a deliberate decision by defendant City to ignore

17 the command of Penal Code §853.6.

18       20.    The denial of due process by the City defendants' deliberate refusal to

19 comply with the mandatory requirements of Penal Code §853.6 is all the more

20 unjustified by the fact that the City erected a high fence around City Hall

21 immediately after completing the arrests, making access to the public fora

22 surrounding City Hall impossible.

23       21.    Before the November 30 events described above - on or about

24 November 17, 2011, following the arrests of two smaller groups of protestors at the

25 Bank of America headquarters – ,the City instituted the policy of denying OR

26 release to individuals who engaged in civil disobedience, or were perceived as

27 engaging in civil disobedience, and were arrested for failure to disperse, trespass and

28 similar non-violent misdemeanor offenses arising from protest activity.  Prior to this

time, the LAPD had routinely applied Penal Code §853.6, as they were required to do, and released misdemeanor arrestees OR if they had no outstanding warrants. However, on November 17, 2011, in response to a request to release the arrestees, Deputy Chief Perez stated that the LAPD would no longer grant OR release to individuals arrested for engaging in civil disobedience.  According to Deputy Chief Perez, the decision was made to deny OR release to "teach people a lesson."   Such a basis for a blanket decision to deny plaintiffs' liberty and detain them without justification for prolonged times violates the First, Fourth and Fourteenth Amendment rights of plaintiffs and the class members and was done with the specific and deliberate intent to interfere with the exercise of plaintiffs' rights to assembly and due process.    It also did not constitute the individualized determination to deny an OR release required by Penal Code §853.6, which statute creates a liberty interest in the right to OR release.

22.    In the three days following arrest of the class members, less than four dozen of the nearly 300 arrested were arraigned.  Each of those individuals had outstanding probation or parole violations, or a warrant based on a failure to appear on a minor offense, such as a traffic ticket.

**PARTIES**

**Plaintiffs:**

23.    Cheryl Aichele is a participant in Occupy Los Angeles.  She is a resident of the City and County of Los Angeles. On November 30, 2011, she was arrested while peaceably and lawfully sitting on City Hall lawn.  Aichele was tightly handcuffed and transported by bus to the Van Nuys jail.  The bus was operated by employees of, and belonged to, the LASD, an entity within the Defendant County of Los Angeles.   She was held on the bus for approximately 6 hours without bathroom facilities, food or water.   While on the bus, Aichele observed other arrestees forced to urinate on themselves after their repeated requests to access bathroom facilities were denied.  Aichele was denied the opportunity to be released

10

on her own recognizance pursuant to Penal Code §853.6 despite the fact that she had no past criminal history and no reasonable suspicion existed to believe that, if released OR, she would immediately engage in purportedly unlawful expressive activity in the public forum of City Hall or elsewhere. Aichele was compelled to post bail to gain her release. No criminal charges were filed against Aichele. She sues as an individual and on behalf of the class of similarly situated individuals she represents.

24. Jonathan Alexander is a reporter for KPFK Radio in Los Angeles. On the night of November 29, 2012, he was reporting live from the lawn of City Hall. As the police began to make arrests, Alexander decided to stay with the protestors and was subsequently arrested. Although there was nothing in Alexander's past to support a belief that, if released, he would immediately engage in alleged criminal activity again, he was held on maximum bail. Alexander was unable to post even a ten-percent bond. He remained in custody at the LAPD's Metropolitan Detention Center ("MDC") until December 2, 2011, when he was finally released without bail. All criminal charges against Alexanader have been dismissed. He sues as an individual and on behalf of all similarly situated class members.

25. Carmina Clemente is a participant in Occupy Los Angeles. She is a resident of the County of Los Angeles. On November 30, 2011, she was arrested while present at City Hall. During the course of her arrest, Clemente, like other female arrestees, was subject to unnecessary and unreasonable force when an officer pinched her nipple and then her inner thigh as a "pain compliance" technique. She suffered bruising to her body where the officer applied the pain compliance technique. Clemente was transported by Los Angeles County employees first to the MDC and then to Van Nuys jail. Throughout this time, she was held in tight handcuffs, which caused pain and visible bruising to her wrists. Clemente was denied OR release despite the fact that she had no prior criminal history. Ultimately, she posted a bond for her release. No criminal charges were filed against Clemente.

1  She sues as an individual and on behalf of the class of similarly situated individuals

2  she represents.

3      26.    Michael Prysner is a resident of Los Angeles County.  He is a war

4  veteran. He was arrested in the early morning hours of November 30, 2011 at City

5  Hall.  Prysner was transported to the MDC, where he was held in tight handcuffs for

6  approximately 7 hours on the cement floor of a parking structure adjoining MDC.

7  Although Prsyner made repeated requests to use the bathroom in the hours after his

8  arrest, and observed other arrestees do the same, he was told by officers that he

9  could do so only if he could urinate with his hands handcuffed behind his back.

10  Prysner was denied OR release despite the fact that he was accused only of

11  committing a non-violent misdemeanor offense: failure to disperse.  He was held for

12  nearly 20 hours before posting the maximum cash bail of $5,000.  No charges were

13  filed against Prsyner.   He sues as an individual and on behalf of the class of

14  similarly situated individuals he represents.

15      27.    James Weitz is a videographer and was not a part of Occupy. Weitz was

16  arrested in the early morning hours of November 30, 2011 in the vicinity of 1st Street

17  and Broadway.  Weitz was never at the lawn of City Hall that night.  Prior to the

18  time of his arrest, Weitz observed officers instruct a group of individuals near Weitz

19  that anyone who did not want to be arrested should get out of the street and go to the

20  public sidewalk farther away from City Hall.   Weitz videotaped the officers'

21  instructions. Weitz readily complied with this order and moved to the sidewalk.

22  Shortly after he did so, he was arrested, along with everyone else who had followed

23  the police directive and moved to the sidewalk so as to avoid arrest.  Weitz was

24  tightly handcuffed and transported by bus to Van Nuys jail.  Once the bus arrived

25  at Van Nuys, Weitz and the other occupants were held in handcuffs for

26  approximately four hours or more and denied access to bathroom facilities, food and

27  water throughout the time that they were held on the bus.  Several arrestees

28  requested to use bathroom facilities and were repeatedly denied permission by the

defendant COUNTY employees.  Arrestees were forced to urinate and defecate on themselves while handcuffed, causing nauseating odors on the enclosed bus.  At least one arrestee was placed in a cage on the bus, causing the individual increased anxiety, which Weitz observed.  After being held for hours on the bus at Van Nuys jail without water and/or bathroom facilities, Weitz and the others were then transported back to downtown Los Angeles to the MDC.  Employees of the defendant County, in the course of driving from Van Nuys to the MDC, stopped in route for coffee and donuts for the deputies while Weitz and the others remained on the bus in handcuffs, as they had been since their arrest.  Weitz was denied OR release despite having no prior criminal record.  He was released early on Friday, December 2, 2011, only after being required to post $2,000 bail, despite the fact that he had no criminal history.  No charges were filed against Weitz.  He sues as an individual and on behalf of the class of similarly situated individuals he represents.

**Defendants:**

28.    Defendant City of Los Angeles is, and at all times relevant herein was, a municipal entity duly organized under the laws of the State of California, with the capacity to sue and be sued.  The City is  a Charter City and subject to the Charter and the City Administrative Code.  The Los Angeles Police Department is a subdivision of the City of Los Angeles.  The City is sued on the basis of its policies, customs and/or practices which gave rise to plaintiffs' federal civil rights claims, as well as on the basis of *respondeat superior* and/or direct liability for the state law claims.

29.    Defendant County of Los Angeles ("County") is a subdivision of the State of California and a government entity duly organized under the laws of the State of California, with the capacity to sue and be sued.  On November 30, 2011, the Los Angeles County Sheriff's Department provided officers and transportation members of the plaintiff class to the LAPD's Van Nuys jail, where plaintiffs

continued to be held on the buses in tight handcuffs for extremely long periods of time.  While the County defendants did not make these arrests, they affirmatively refused to loosen painfully tight handcuffs, refused to provide access to bathrooms, and ridiculed plaintiffs when they requested assistance, telling plaintiffs to urinate and defecate on themselves.  The County employees charged with transporting plaintiffs had the duty to intervene to prevent or halt unlawful and/or unconstitutional conduct  complained of herein.

30.    Mayor Antonio Villaraigosa is the chief executive officer of the City of Los Angeles.   Unless otherwise provided by the City Charter, the Mayor has authority over all departments in the City.   Pursuant to the City Charter and Administrative Code, the Mayor must act to approve or disapprove resolutions passed by the City Council, either by express action or by operation of law.  Under the terms of the City laws, resolutions passed by the City are the official policy of the City unless and until revised or rescinded.   Mayor Villaraigosa had the opportunity to reject the resolution of the City Council concerning Occupy's presence at City Hall but did not do so.  On information and belief, plaintiffs allege that Mayor Villaraigosa directed the closing of the City Hall lawn public fora and directed the Los Angeles Police Department to arrest plaintiffs if they did not disperse. Mayor Villaraigosa is sued in his individual and official capacity.

31.    Chief Charlie Beck is the head of the Los Angeles Police Department. At all times relevant herein, he was the command staff employee of the LAPD who gave final approval to the plan, supervision, and execution of the police conduct complained of herein.  To the extent, if any, that Beck did not personally approve the plan to disperse, arrest, detain and incarcerate plaintiffs for prolonged times, he expressly delegated his authority as a policy maker to members of his command staff, including but not limited to Assistant Chief Paysinger of the Office of Operations, Deputy Chief Jacobs of the Office of Operations, and Deputy Chief Jose Perez of Central Bureau.  Regardless of the degree of delegation of his authority as

14

the policy maker for the Los Angeles Police Department and the City of Los Angeles on the issues raised by plaintiffs' claims, Beck ratified and/or condoned the policies, practices and customs employed in the arrest and detention of plaintiffs as complained of herein.  At a press conference held by defendant Villaraigosa and Beck on November 30, 2011, following the arrests of plaintiffs and the class they represent, Beck acknowledged the process of developing the plan for the arrests of plaintiffs and his approval of the plan.  Beck is sued in his individual and official capacity.

32.    Plaintiffs are ignorant of the true names and/or capacities of defendants sued herein as DOES 1 through 100, inclusive, and therefore sue said defendants by such fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  The Doe defendants include individual employees of the defendant City and County, who caused, participated in, and/or failed to intervene to prevent the conduct complained of herein. Plaintiffs are informed and believe and therefore allege that each of the Doe defendants is legally responsible and liable for the incident, injuries and damages claimed herein, and that each Doe defendant proximately caused said incidents, injuries and damages by reason of their negligence, breach of duty, negligent supervision, management or control, violation of constitutional and legal rights, or by reason of other personal, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, or control, or upon any other act or omission. Plaintiffs will seek leave to amend this complaint to insert further charging allegations when such facts are ascertained.

33.    Each of the defendants, including defendants DOES 1 through100, caused, and is responsible for, the unlawful conduct and resulting injuries suffered by plaintiffs and the class they represent by, among other things, personally participating in the unlawful conduct, or acting jointly, or conspiring with others who did so; by authorizing, acquiescing in, or setting in motion policies, plans or

actions that led to the unlawful conduct; by failing to take action to prevent the unlawful conduct; by failing and refusing with deliberate indifference to plaintiffs' rights to initiate and maintain adequate training and supervision; and by ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

34.   In doing the acts alleged herein, defendants, and each of them, acted within the course and scope of their employment.

35.   In doing the acts and/or omissions alleged herein, defendants, and each of them, acted under color of authority and/or under color of law.

36.   In doing the acts and/or omissions alleged herein, defendants, and each of them, acted as the agent, servant, employee and/or in concert with each of said other defendants.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

37.   Plaintiffs timely filed claims with the defendant City of Los Angeles and the defendant County of Los Angeles pursuant to California Government Code §810 et seq.  The claims were filed on behalf of individual named plaintiffs and on behalf of the class of similarly situated individuals they represent.  The claims were denied by all defendants, either by written letters of advisement or by operation of law.  Plaintiffs have exhausted all administrative remedies available to them.

**CLASS ACTION ALLEGATIONS**

38.   The proposed damages class is defined as all person who were arrested in or around the vicinity of City Hall on November 30, 2011, for participating in the Occupy protest and/or for allegedly failing to disperse. The proposed damages subclasses are defined as:

   a.   All persons who were arrested while participating in the Occupy protest at Los Angeles City Hall on November 30, 2011 ("Occupy Sub-Class");

   b.   All persons who were arrested in the vicinity of City Hall on

November 30, 2011, but who were not participating in the Occupy protest and who complied with all police orders prior to their arrest ("Vicinity Sub-Class");

39.     The proposed injunctive relief class is defined as all individuals who were denied release on their own recognizance, pursuant to Penal Code §853.6, without reasonable suspicion to believe that they were not eligible for OR release.

40.     The claims of the proposed class and each subclass satisfy the requirements of Federal Rule of Civil Procedure 23(b)(3) and, alternately, Rule 23(b)(2).

41.     The total of those arrested in the event giving rise to this action is approximately 292 persons and, therefore, too numerous for joinder.  The Vicinity sub-class of those arrested outside of the City Hall lawn is approximately 60 individuals.

42.     The defendants arrested putative class as a group and treated all arrestees the same, acting on grounds that apply generally to the classes.  The named plaintiffs' claims that their First, Fourth and Fourteenth Amendment rights and their analogous state Constitution, statutory and common law rights were violated raise common questions of law and fact.

43.     The claims that the class members' First, Fourth and Fourteenth Amendment rights were violated raise common questions of law and fact that predominate over any questions affecting only individual members.  This includes arrest without probable cause based on an unlawful dispersal order, arrest of the sub-class of those outside of City Hall lawn without any dispersal order or probable cause, excessive force in handcuffing, denial of bathroom facilities, and violation of all class members' liberty interests by the deliberate decision to incarcerate the class on the basis of their having engaged in what Defendant City alleges was civil disobedience and/or their association with individuals who the Defendant City believed had engaged in civil disobedience and, thereby, deny plaintiffs the liberty

1  interest codified in California Penal Code §853.6.

2      44.    The claims by the class and each subclass that the arrests violated their

3  First  Amendment rights to engage in, observe or associate with expressive and

4  assembly activities present common questions of law and fact that predominate over

5  any questions affecting only individual members.

6      45.    The claims of the named plaintiffs are typical of the claims of the class,

7  as each was engaged  in or associating with peaceable and lawful free speech and

8  assembly activity when each was arrested on November 30, 2011 as part of a

9  deliberate plan characterized by Defendan Beck as "shock and awe" against the

10  class as a whole.

11     46.    The representative plaintiffs will fairly and adequately protect the

12  interests of the class because they were subject to the unlawful law enforcement

13  conduct complained of herein, and have no interests antagonistic to other members

14  of the class.  In addition, plaintiffs' counsel are experienced in litigating federal civil

15  rights cases and class actions.

16     47.    The named plaintiffs are represented by counsel with extensive class-

17  action experience in civil rights cases.  Attorneys Hoffman, Litt and Sobel have

18  successfully  litigated  a  number  of  class-action  cases  involving  the  rights  of

19  protesters in Los Angeles.  Most recently, Hoffman, Litt and Sobel were appointed

20  by the court as class counsel in *Multi-Ethnic Immigrant Worker Network v. City of*

21  *Los Angeles*, 24 F.R.D.  621  (C.D. Cal. 2007), challenging the LAPD's assault on

22  a lawful immigrant rights rally in MacArthur Park on May 1, 2007.  The case

23  resulted in a settlement of $12,850,000, the largest amount paid nationally in a

24  protest case in which there were no arrests of the plaintiffs.  In addition to class-

25  action protest litigation, attorneys Hoffman, Litt, Sobel and Stormer have served as

26  class counsel in numerous other class actions involving civil rights claims..

27     48.    The defendants have acted and refused to act on grounds generally

28  applicable to the class, and injunctive and declaratory relief for the class as a whole

18

is appropriate.

49.     The prosecution of separate actions by individual members of the class would create a risk of inconsistent or incompatible standards of conduct for the defendants, thereby making a class action the superior method of adjudicating the controversy.

## MONELL CLAIMS

50.     The City of Los Angeles maintains a policy, practice and/or custom of engaging in mass unlawful dispersal orders to protesters in the absence of a lawful basis to order those engaged in expressive activity to leave a public forum.

51.     The violation of constitutional and statutory rights complained of herein resulted from a policy, practice and/or custom of the CITY and was directed, approved and/or ratified by Mayor VILLARAIGOSA and LAPD Chief BECK. Mayor Villaraigosa and Chief Beck are policy makers for the City.  To the extent that they did not personally direct the policy, practice and/or custom at issue, their authority as policymakers, and specifically the authority of Chief Beck, was expressly delegated to Assistant Chief Paysinger and Deputy Chiefs Jacobs of the LAPD's Office of Operations and to Deputy Chief Perez, the commander of Central Division, the geographic subdivision of the LAPD which includes downtown Los Angeles.  Each of these individuals - Mayor Villaraigosa, Chief Beck, Asst. Chief Paysinger, Deputy Chief Jacobs and Deputy Chief Perez - was present during the execution of the policy.  Moreover, on information and belief, plaintiffs allege that the Los Angeles Police Commission was advised of, and approved in advance, the plan developed for the removal and arrest of the Occupy demonstrators and those believed by defendants to be associated with them.   Members of the Police Commission were present as the arrests were executed.

52.     On information and belief, plaintiffs allege that Chief Paysinger and Deputy Chief Jacobs were delegated by Chief Beck with the authority to set policy and direct that the liberty interest guaranteed by Penal Code §853.6 and the

Fourteenth Amendment would be denied to everyone arrested on November 30 in the assault on the Occupy demonstration, regardless of whether there was reasonable individualized suspicion to believe that any of the 292 individuals arrested on November 30 should be denied his or her liberty based on facts supporting one or more of the limited list of exceptions to the requirement of mandatory OR release in Penal Code §853.6 for misdemeanor arrestees.

53.     The denial of OR release to the plaintiff class on November 30, 2011 involved the application of a policy first applied by the LAPD on or about early November, 2011.  On information and belief, plaintiffs allege that the LAPD instituted such a policy to deny OR release to protestors who were arrested on misdemeanor charges for engaging in civil disobedience.  The policy, practice and/or custom of denying OR release was instituted for the purpose of "teaching a lesson" to individuals who engaged in civil disobedience.  There was no individualized suspicion to believe that each and every arrestee came within one of the enumerated exceptions to mandatory OR release as provided by Penal Code §853.6.  There is no possible basis for such a policy, practice or custom other than to retaliate for the exercise of First Amendment rights.

54.     Each of these policy makers, whether directly or by express delegation, participated in, caused, approved or ratified the arrest and prolonged detention of the plaintiff class. This included through issuing, approving and/or ratifying the order to arrest the class, and through issuing, approving and/or ratifying the order to deny OR release for plaintiffs in violation of Penal Code §853.6.  Additionally, individual supervisory officers had the duty to exercise appropriate command authority in their supervision of their subordinates and   failed to do so, resulting in the unconstitutional deprivations complained of herein. Individual officers had the duty to intervene to prevent or halt unlawful and/or unconstitutional conduct complained of herein, including the mass false arrest of the class.

**DECLARATORY, INJUNCTIVE AND DAMAGES RELIEF**

55.     Paragraphs 1 through 54 are incorporated by reference as if set forth herein.

56.     The public fora encircling City Hall have historically been used for large protests.  The City defendants were fully aware of the expressive activity engaged in by the plaintiff class.  The Los Angeles City Council unanimously passed a formal resolution expressing support for the continued presence of Occupy on City Hall lawn as First Amendment expression.  The City's subsequent reversal and decision to apply park regulations 59 days after plaintiffs began exercising First Amendment rights in this archetypal public forum is a transparent attempt to restrict Occupy LA's speech.

57.     The City defendants' actions in participating in, executing, causing to be executed, failing to intervene to cause the cessation of, approving or ratifying the arrest of the  plaintiff class on November 30, 2011 on or at the Los Angeles City Hall violated the rights of plaintiffs pursuant to the First, Fourth and Fourteenth Amendments to the U.S. Constitution.

58.     The City defendants have adopted municipal policies, practices and customs that have caused the violations complained of herein; and, in the alternate, have actual or constructive notice of the constitutional violations described herein and have failed to take action, thereby allowing the continuation of such a policy or custom, and causing the harms complained of herein.

59.     As a direct and proximate result of the conduct of defendants described herein, the named individual plaintiffs have been denied their constitutional, statutory and legal rights as stated below, and have suffered general and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety and other damages in an amount according to proof.

60.     Defendants' acts were willful, wanton, malicious and oppressive and

done with conscious disregard and deliberate indifference for plaintiffs' rights.

61.    Defendants' policies, practices, customs, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to plaintiffs, including but not limited to violations of their constitutional and statutory rights. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein.  The plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in demonstrations and expressive activities in the City of Los Angeles.  Defendants' conduct described herein has created uncertainty among plaintiffs with respect to their exercise now and in the future of these constitutional rights.  Specifically, Plaintiffs are concerned that, if arrested, whether lawfully or unlawfully, they will again be denied the liberty interest codified in California Penal Code §853.6 and will be detained until their arraignment unless and until they post a monetary bond. Plaintiffs therefore seek injunctive relief from this court, to ensure that plaintiffs and persons similarly situated will not suffer violations of their rights from defendants' illegal and unconstitutional policies, customs and practices as described herein.

62.    Plaintiffs also seek injunctive relief in the form of an order requiring that defendants expunge, seal and destroy any records derived from plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from the plaintiff class, and identify to the plaintiff class all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

63.    An actual controversy exists between plaintiffs and defendants in that plaintiffs contend that the policies, practices and conduct of defendants alleged herein are unlawful and unconstitutional, whereas plaintiffs are informed and believe that defendants contend that said policies, practices and conduct are lawful and constitutional.  Plaintiffs seek a declaration of rights with respect to this

1    controversy.

2    **FIRST CLAIM FOR RELIEF**

3    **Violation Of First Amendment To The United States Constitution**

4    **(42 U.S.C. § 1983); Violation of the California Constitution, Article I, §§2, 3**

5    64.    Plaintiffs re-allege and incorporate by reference the preceding

6    paragraphs of this complaint.

7    65.    Defendants' above-described conduct violated plaintiffs' rights to

8    freedom of speech, assembly and association under the First Amendment to the

9    United States Constitution and the analogous provisions of the California

10    Constitution.

11    66.    Defendants' above-described conduct was willful, deliberate and

12    intended to cause harm to plaintiffs based on the exercise of their fundamental

13    rights.

14    67.    As a direct and proximate result of Defendants' unlawful actions,

15    plaintiffs, and each member of the putative class that they represent, endured pain

16    and suffering.

17    **SECOND CLAIM FOR RELIEF**

18    **Violation Of Fourth Amendment To United States Constitution**

19    **(42 U.S.C. § 1983); California Constitution Article I, §7**

20    68.    Plaintiffs re-allege and incorporate by reference the preceding

21    paragraphs of this complaint.

22    69.    Defendants' above-described conduct violated plaintiffs' rights to be

23    free from unreasonable seizures and excessive and/or arbitrary force and/or arrest

24    and/or detention without reasonable or probable cause under the Fourth Amendment

25    to the United States Constitution.  Defendants intentionally imprisoned the class in

26    a parking structure and on buses for hours, in tight handcuffs, and held plaintiffs in

27    the jails in violation of Penal Code section 853.6, and for an unreasonably prolonged

28    period of time and under unreasonably inhumane conditions.

23

70.     Defendants' above-described conduct was willful, deliberate and intended to cause harm to plaintiffs based on the exercise of their fundamental rights.

71.     As a direct and proximate result of Defendants' unlawful actions, plaintiffs, and each member of the putative class that they represent, endured pain and suffering.

**THIRD CLAIM FOR RELIEF**

**Violation Of Fourteenth Amendment To United States Constitution**

**(42 U.S.C. § 1983); California Constitution Article I, §7**

72.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this complaint.

73.     Defendants' above-described conduct deprived plaintiffs of liberty without due process of law under the Fourteenth Amendment to the United States Constitution. Based on their perceived association with Occupy and their purported engagement in "civil disobedience," Plaintiffs were uniformly denied the mandatory "liberty" interest codified at California Penal Code §853.6 when they were denied released on their own recognizance and either required to post bail, or held for nearly three days before being released without charges.

74.     Defendants' above-described conduct was willful, deliberate and intended to cause harm to plaintiffs based on the exercise of their fundamental rights.

75.     As a direct and proximate result of Defendants' unlawful actions, plaintiffs, and each member of the putative class that they represent, endured pain and suffering.

**FOURTH CLAIM FOR RELIEF**

**Violation Of Fourteenth Amendment To United States Constitution**

**(42 U.S.C. § 1983); California Constitution Article I, §13**

76.     Plaintiffs re-allege and incorporate by reference the preceding

paragraphs of this complaint.

77.   Defendants' above-described conduct violated plaintiffs' rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

78.   Defendants' above-described conduct was willful, deliberate and intended to cause harm to plaintiffs based on the exercise of their fundamental rights.

79.   As a direct and proximate result of Defendants' unlawful actions, plaintiffs, and each member of the putative class that they represent, endured pain and suffering.

### FIFTH CLAIM FOR RELIEF

### False Arrest and/or False Imprisonment

80.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this complaint.

81.   Plaintiffs were arrested and imprisoned without reasonable or probable cause to believe that they committed any crime.

82.   Defendants intentionally imprisoned the class in a parking structure, buses and the jails in violation of Penal Code section 853.6, and for an unreasonably prolonged period of time and under unreasonably inhumane conditions.

83.   Defendants' above-described conduct was willful, deliberate and intended to cause harm to plaintiffs based on the exercise of their fundamental rights.

84.   As a direct and proximate result of Defendants' unlawful actions, plaintiffs, and each member of the putative class that they represent, endured pain and suffering.

### SIXTH CLAIM FOR RELIEF

### Violation of California Civil Code § 52.1

85.   Plaintiffs re-allege and incorporate by reference the preceding

paragraphs of this complaint.  The CITY defendants explicitly determined in advance of the arrests to deny plaintiffs any consideration under the legislative directive for mandatory release without bail codified in Penal Code §853.6. Defendants did so for the purpose of punishing plaintiffs for engaging what defendant CITY believed was civil disobedience and to deter plaintiffs and others from exercising First Amendment rights and engaging in alleged civil disobedience in the future.

86.   Defendants' above-described conduct constituted interference, and attempted interference, by threats, intimidation and coercion, with plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code section 52.1.

87.   Defendants' above-described conduct was willful, deliberate and intended to cause harm to plaintiffs based on the exercise of their fundamental rights.

88.   As a direct and proximate result of Defendants' unlawful actions, plaintiffs, and each member of the putative class that they represent, endured pain and suffering.

### SEVENTH CLAIM FOR RELIEF

#### Negligence

89.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this complaint.

90.   Defendants have a duty of care to plaintiffs to ensure that defendants did not cause unnecessary or unjustified harm to plaintiffs, and a duty of care to hire, train, supervise and discipline their officers and employees so as to not cause harm to plaintiffs and to prevent violations of plaintiffs' constitutional, statutory and common law rights.

91.   The above-described acts and omissions of defendants breached the

duty of care defendants owed to the named individual plaintiffs.

92.    As a direct and proximate result of Defendants' unlawful actions, plaintiffs, and each member of the putative class that they represent, endured pain and suffering.

**PRAYER FOR RELIEF**

1.    For an order certifying the class defined herein pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (3);

2.    For preliminary and permanent injunctive relief restraining defendants from engaging in the unlawful and unconstitutional actions complained of above;

3.    For preliminary and permanent injunctive relief requiring defendants to expunge, seal and destroy all records derived from this arrest, including all fingerprints, photographs, identification and descriptive information collected from the plaintiff class;

4.    For entry of an order that disclosure be made in writing to plaintiffs and the Court as to all entities and agencies to which such material has been disseminated and by whom gathered; and that all records disseminated be collected and sealed, including all copies of such disseminated records that may have been subject to dissemination by others;

5.    For entry of an order declaring the arrests null and void;

6.    For a declaratory judgment that defendants' conduct complained of herein was a violation of plaintiffs' rights under the Constitution and laws of the United States and California;

7.    For general and compensatory damages for violation of plaintiffs' federal and state constitutional and statutory rights, pain and suffering, all to be determined according to proof;

8.     For punitive and exemplary damages in amounts to be determined according to proof as to the individual defendants;

9.     For an award of statutory damages and penalties pursuant to Cal. Civil Code section 52(b) to be determined according to proof;

10.    For attorneys' fees pursuant to 42 U.S.C. § 1988 and California Civil Code section 52(b) and section 52.1(h), and California Code of Civil Procedure section 1021.5;

11.    For costs of suit;

12.    For pre- and post-judgment interest as permitted by law;

13.    For such other and further relief as the Court may deem just and proper.

Dated: April 11, 2013          Respectfully submitted,

Hadsell Stormer Richardson & Renick, LLP
Kaye, McLane, Bednarski & Litt
Law Office of Carol A. Sobel
Law Office of Colleen M. Flynn
Schonbrun, DeSimone, Seplow, Harris, Hoffman & Harrison

/s/
By: CAROL A. SOBEL
Attorneys for Plaintiffs