BARRETT S. LITT, SBN 45527
Email: blitt@kmbllaw.com
DAVID M. MCLANE, SBN 124952
Email: dmclane@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT
234 Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

CAROL A. SOBEL, SBN 84483
Email: carolsobel@aol.com
LAW OFFICE OF CAROL A. SOBEL
3110 Main Street, Suite 210
Santa Monica, California 90405
Telephone: (310) 393-3055
Facsimile: (310) 451-3858

ADDITIONAL COUNSEL LISTED ON
NEXT PAGE
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Cheryl Aichele, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>City of Los Angeles, et al.,<br><br>Defendants. | Case No CV 12-10863- DMG-FFM (x)<br><br>[Honorable Dolly M. Gee]<br><br>PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS; MEMORANDUM OF LAW; DECLARATION OF BARRETT S. LITT<br><br>Hearing Date:  August 28, 2015<br>Hearing Time:  10:00 A.M.<br>Courtroom:     7<br><br>Trial Date:    N/A<br>Time:          N/A |

ADDITIONAL PLAINTIFFS' COUNSEL

HADSELL STORMER, & RENICK, LLP
DAN STORMER, SBN 101967
128 North Fair Oaks Avenue
Pasadena, California 91103
Tel. 626 585-9600
Fax. 626 577-7079
Email: dstormer@hskrr.com
Email: l.ellis@hskrr.com

SCHONBRUN, DE SIMONE, SEPLOW,
HARRIS & HOFFMAN
PAUL HOFFMAN, SBN 71244
CATHERINE SWEETSER, SBN271142
732 Ocean Front Walk
Venice, California 90291
Tel. 310 396-0731
Fax. 310 399-7040
Email: hoffpaul@aol.com
Email: catherine.sdshhh@gmail.com

LAW OFFICE OF COLLEEN FLYNN
COLLEEN M. FLYNN SBN 234281
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Tel: 213 252-9444
Fax: 213 252-0091
Email: cflynnlaw@yahoo.com

**TO THE COURT, DEFENDANTS, AND THEIR COUNSEL OF RECORD:**

**NOTICE IS HEREBY GIVEN** that on August 28, 2015, at 10:00 a.m., or as soon thereafter as the parties may be heard, in Courtroom 7 of the above court, located at 312 North Spring Street, Los Angeles, California, Plaintiffs will and do hereby move for an award of attorneys' fees and costs pursuant to the terms of the Settlement Agreement and Preliminary Approval Order in this case.

This motion is based upon this Notice of Motion and Motion, all papers and pleadings on file in this action, and upon such other and further evidence and argument as the Court deems necessary or convenient at the time of the hearing on this matter.

Dated: June 5, 2015                    Respectfully Submitted,

KAYE, MCLANE, BEDNARSKI & LITT
LAW OFFICES OF CAROL SOBEL
SCHOENBRON, DESIMONE, ET AL.
HADSELL, STORMER & RENNICK

By:__/s/ Barrett S. Litt_____
     Barrett S. Litt


By:__/s/ Carol A. Sobel_____
     Carol A. Sobel
     Attorneys for Plaintiff

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........................................1

I.   INTRODUCTION ...........................................................................................1

II.  DESCRIPTION OF PLAINTIFFS' CLAIMS.............................................2

III. ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE
     ATTORNEYS' FEE AWARD. ......................................................................6

     A   The Complexity Of The Issues And The Risk Of Non-Payment ........6
         1. The Legal Issues Are Complex And Unsettled. ...........................7
         2. Class Actions Are Inherently Risky. ...........................................7
         3. The Management of the Case was Challenging. ..........................7
         4. Reaching A Settlement Was Difficult. .........................................8

     B   The Risks Of Non-Payment Were Substantial ...................................8

     C   The Effort Expended By Counsel. ......................................................9

     D   The Result Obtained For The Class.....................................................9

     E   Counsel's Experience .......................................................................10

     F   Counsel's Skill .................................................................................10

     G   The Reaction Of The Class...............................................................11

IV.  THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL
     IS REASONABLE........................................................................................11

     A   The Percentage of the Fund Method of Calculating Fees Is the Better
         Method to Calculate Fees And Supports The Fee Request Here. .......11

     B   Although A Lodestar Cross-Check Is Unnecessary, It More Than
         Supports The Fee Requested Here.....................................................16

V.   CONCLUSION.............................................................................................19

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. Bedolla*
  __ F.3d __, 2015 WL 3461537 (9th Cir. June 2, 2015) .................................... 16

*Condominium Ass'n v. Dunkle*
  946 F.2d 768 (11th Cir.1991) ....................................................................... 13

*Craft v. Cnty. of San Bernardino*
  624 F. Supp. 2d 1113 (C.D. Cal. 2008) ......................................................... 18

*Fernandez v. Victoria Secret Stores, LLC*
  No. CV 06-04149 MMM SHX, 2008 WL 8150856 (C.D. Cal. July 21, 2008) . 16

*Gaskill v. Gordon*
  160 F.3d 361 (7th Cir. 1998) ........................................................................ 15

*Glass v. UBS Financial Services, Inc.*
  2007 WL 221862 (N.D.Cal. 2007) ................................................................ 16

*Goldberger v. Integrated Resources, Inc.*
  209 F.3d 43 (2d Cir.2000) ............................................................................. 17

*In re Bluetooth Headset Products Liab. Litig.*
  654 F.3d 935 (9th Cir. 2011) ........................................................................ 16

*In re Enron Corp. Securities, Derivative & ERISA Litigation*
  586 F.Supp.2d 732 (S.D.Tex. 2008) .............................................................. 11

*In re Quintus Sec. Litig.*
  148 F.Supp.2d 967 (N.D.Cal.2001) ................................................................. 6

*In re Remeron Direct Purchaser Antitrust Litigation*
  2005 WL 3008808 (D.N.J. 2005) .................................................................. 15

*In re Rite Aid Corp. Securities Litigation*
  396 F.3d 294 (3rd Cir. 2005) .................................................................... 15, 16

*In re Washington Public Power Supply System Securities Litigation*
  19 F.3d 1291 (9th Cir. 1994) .................................................................... 11, 18

*Mashburn v. National Healthcare, Inc.*
  684 F.Supp. 679 (M.D.Ala.1988) ............................................................. 13, 14

ii

*Paul, Johnson, Alston & Hunt v. Graulty*
    886 F.2d 268 (9th Cir. 1989) ...................................................................11

*Six Mexican Workers v. Arizona Citrus Growers*
    904 F.2d 1301 (9th Cir.1990) ...................................................................14

*Swedish Hosp. Corp. v. Shalala*
    1 F.3d 1261 (D.C.Cir.1993) ......................................................................12

*Van Vranken v. Atlantic Richfield Co.*
    901 F.Supp. 294 (N.D.Cal. 1995) ............................................................14

*Vizcaino v. Microsoft Corp.*
    290 F.3d 1043 (9th Cir. 2002) ..........................................................11, 12, 13, 14

## OTHER CASES

*In re Heritage Bond Litigation*
    2005 WL 1594403 .......................................................................................6

## FEDERAL STATUTES

42 U.S.C. §1988 ...............................................................................................6

Freedom of Information Act ............................................................................9

## OTHER STATUTES

California Penal Code §853.6 ......................................................................5, 7

## CONSTITUTIONAL PROVISIONS

First Amendment............................................................................................2, 7

## OTHER AUTHORITIES

"Empirical Study of Class Actions in Four Federal District Courts: Final Report to
    the Advisory Committee on Civil Rules" ("FJC Report")..................................12

Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and
    Class Counsel's Response* ..................................................................................13

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Class Counsel seek an award of $668,750 (25% of the total class fund), plus costs of $5608.93 (exclusive of class administration costs), out of a total class fund of $2,675,000, to be paid separately from payments made to class members pursuant to the provisions of the settlement agreement. The settlement agreement provides as follows regarding money distributions to class members, subject to the final approval of the Court:

(a) Each class member who files a timely, valid claim shall be allocated four points. This covers claims for the arrest and conditions on the bus.[1]

(b) Each class member who files a timely, valid claim who qualifies as a member of the Vicinity Sub-Class (people arrested in the area but not on City Hall lawn either because they were not involved or followed police directions to remove themselves and were nonetheless arrested) shall be allocated an additional four points.

(c) Each class member who files a timely, valid claim who qualifies as a member of the OR Sub-Class and spent 36 hours or less in custody (measured from the time of arrest) shall be allocated an additional two points.

(d) Each class member who files a timely, valid claim who qualifies as a member of the OR Sub-Class and spent more than 36 hours in custody shall be allocated an additional four points.

(e) No class member who files a timely, valid claim shall receive less than $4,000. If, and to the extent necessary, the distribution formula will be adjusted so that all members who are allocated four points will receive

---

[1] The Court certified various sub-classes, including arrest, bus conditions, vicinity arrests and failure to provide release on OR. Because the settlement does not precisely track the sub-classes, we do not discuss them in this Memorandum.

1

$4,000, the remaining funds will be distributed pro rata even if that means the class members receiving four points end up receiving more per point than other class members.

(f) Each Named Plaintiff shall receive the amount due to him or her under the foregoing formula plus a $5,000 Class Representative Payment for their special contributions to the case as Named Plaintiffs.

## II.   DESCRIPTION OF PLAINTIFFS' CLAIMS

Beginning October 1, 2011, peaceful protestors – one of many "Occupy" gatherings around the country – first assembled on the south lawn at City Hall, a long-standing assembly area for expressions of free speech and protest in Los Angeles, and a quintessential public forum. On that first night and for several subsequent nights, after long discussions with City officials, Occupy participants were required to move their tents off the City Hall lawn at night. But, within just a few days the City no longer imposed that requirement and permitted the tents to stay up in plain view around the clock.

The protestors maintained tents in round-the-clock vigils at City Hall to symbolize the economic crisis that has resulted in historic levels of foreclosures of homes, while financial institutions benefit from public bail outs. At the outset, several elected City officials gave their full endorsement to the protest and personally visited the area. In mid-October, 2011, the City Council unanimously passed a resolution stating that "the City of Los Angeles hereby stands in SUPPORT for the continuation of the peaceful and vibrant exercise in First Amendment Rights carried out by Occupy Los Angeles." Mayor Villaraigosa did not exercise his right to veto the resolution and, in fact, personally brought tarps to the site for protection from rain.

Under the City Administrative Code, the Mayor had the opportunity to veto the resolution but expressly decided not to do so. At every instance, City officials communicated to plaintiffs permission to be present at City Hall lawn and engage in their round-the-clock vigil against economic injustices.

The protestors set up tents as an expression of their message opposing economic inequality, bailouts for Wall Street and foreclosures for "Main Street". Initially, at the direction of the City defendants, plaintiffs moved their tents to the public sidewalks late each night, where they slept until morning. After a short time, plaintiffs were allowed to remain with their tents on the lawn at night. At the time that the participants in Occupy assembled on the City Hall lawn, the forum had never been posted with any notice that it was a "park" and the City had never treated it as such.

Throughout the time that Occupy was present at City Hall lawn, the participants repeatedly met with City officials to address any concerns the City had about the demonstration. On several occasions, the City asked the County Health Department to inspect the protest area. Occupy immediately addressed any concerns raised by the County Health Department and complied fully to alleviate any potential problems.

At the time that the participants in Occupy assembled on the City Hall lawn, the only restriction in the Los Angeles Municipal Code ("LAMC") on "camping" was set forth in LAMC 63.44(c), and was limited to beach property and those areas posted as parks. Only months after plaintiffs were unlawfully arrested did the City amend the Municipal Code for the specific purpose of identifying City Hall lawn as a "park" in which "camping" was prohibited. In the late spring of 2012, the City Attorney drafted an amendment to Los Angeles Municipal Code §63.44 (prohibiting camping and tents in public parks), which was not adopted by the City Council until six months after plaintiffs were arrested. Before that time the City Hall lawn had never been designated a "park" or subject to the restrictions applicable to parks under the relevant codes. Through that time, the City had no procedures regarding permits for the area, nor did it impose permit requirements at any time on the Occupy protestors.

On Friday, November 25, 2011, City Officials announced at a press conference that Occupy would no longer be allowed to engage in the same expressive activities it had engaged in for the past eight plus weeks at City Hall. There was no process by which this decision was made other than executive fiat. Shortly after that press conference, City

employees tacked paper signs to trees, announcing that the area was now subject to closure at night under the City's park regulations. The protestors were ordered to leave the forum where they had been peaceably assembled, with approval of the City Council, for 59 days.

The City, through the Mayor and the LAPD, developed and executed a plan to eject plaintiffs from City Hall lawn, which involved an unprecedented show of force by the LAPD. In the words of Chief Beck, the aim of the LAPD was to utilize "shock and awe," a notorious militaristic approach associated with former Secretary of Defense Donald Rumsfeld in the 2003 invasion and bombing of Iraq in search of elusive "weapons of mass destruction."

The City defendants began execution of their campaign of "shock and awe" at approximately 12:00 a.m. on November 30, attacking from all sides with one group of officers bursting out of the doors of City Hall and knocking down anyone in their path. As officers prepared to make arrests, they advised that anyone who did not want to be arrested should leave City Hall lawn and stand in a particular place identified by the officers. But when some of the plaintiffs followed those orders, they were "kettled" by other officers and arrested, despite the fact that they had fully complied with the order to disperse. In addition, officers indiscriminately arrested individuals who were several blocks from the "shock and awe" target, including individuals who had not been present for a dispersal order. The Plaintiff class in this case is comprised of those arrested in connection with the LAPD's Occupy-related arrests on that night.

Following their arrests, plaintiffs were transported to the LAPD's Metropolitan Detention Center (""MDC") or to the Van Nuys jail. Those taken to the MDC were held in tight handcuffs in a parking structure adjacent to the jail. They were kept there for hours and denied access to bathroom facilities and water. Their requests to loosen their handcuffs were ignored. Their requests to use bathroom facilities were similarly denied, with male arrestees told they could do so if they could urinate with their hands handcuffed behind their backs. Those plaintiffs transported to Van Nuys jail were held on

4

buses for approximately 7 hours, and in one instance nearly 10 hours with no access to bathroom facilities or water, tightly handcuffed the entire time. Their requests to loosen their handcuffs were ignored. In response to requests to use bathroom facilities, they were told to urinate and defecate on themselves, which some were forced to do, and everyone else on the buses was forced to smell.

The majority of plaintiffs were incarcerated for approximately 60 hours despite the fact that they were entitled to release on their own recognizance ("OR") pursuant to California Penal Code §853.6. This statute requires, in mandatory language, that law enforcement release misdemeanor arrestees, such as plaintiffs, on their own recognizance either prior to, or immediately after, booking unless one of a limited number of exceptions applies. Prior to the Occupy events, the LAPD had routinely released misdemeanor arrestees OR if they had no outstanding warrants. However, on November 17, 2011, in response to a request to release a group of Occupy-related arrestees, Deputy Chief Perez stated that the LAPD would no longer grant OR release to individuals arrested for engaging in civil disobedience. According to Deputy Chief Perez, the decision was made to deny OR release to "teach people a lesson." The majority of class members were held on this basis, with the minority of them being released within 36 hours of arrest and the remainder within 72 hours. LAPD did not make individualized assessments of who qualified for release under the statute,

Plaintiffs' claims in this case were broken down into different groupings. All class members were arrested and held in the described conditions on the buses. A group of arrestees were either uninvolved in the Occupy protests at all or, at the direction of the police, had removed themselves from City Hall lawn but were nonetheless arrested. Most, but not all of the arrestees, were held without being released on their own recognizance ("OR") although they were entitled to it, some for less than 36 hours and some for longer, but not for more than three days. Each of these groupings provided the basis of claims that the City's conduct was unlawful. The settlement takes account of the different groupings in apportioning the settlement among class members.

The instant lawsuit was filed on December 12, 2012. Extensive investigation was done both before and after the filing of the lawsuit to gather information to support the claims. In addition, discovery was conducted after the lawsuit was filed. Highly contested motions to certify the class as to both the City and the County[2] occurred, including the filing of a motion to certify, separate oppositions by both the City and County, separate reply briefs regarding each, and a hearing.

## III. ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD.

Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar. *See, e.g., In re Heritage Bond Litigation,* 2005 WL 1594403 at 18*; In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 973-74 (N.D.Cal.2001). Because this provides a useful framework for analyzing the appropriate fee award here, counsel will employ that framework in analyzing the requested fee here, although we will reverse the order of discussion.

### A. THE COMPLEXITY OF THE ISSUES AND THE RISK OF NON-PAYMENT

Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. §1988) was passed in 1976. The legislative history states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011, 1976 U.S.Code Cong. & Admin.News at 5913.

---

[2] The County's role in the case was limited to providing deputies on LASD buses. It was not involved in the arrests or in the OR decisions. Thus, its share of the settlement is limited.

6

### 1.    The Legal Issues Are Complex And Unsettled.

The issues involved in this case involve complex issues of constitutional law in an area  of conflicting circuit law on the issues involved. The legality of the arrests involved complex and largely uncharted First Amendment questions. Similarly, there is no law addressing the standards for OR release under Penal Code §853.6. The claims of tight handcuffing and other conditions on the bus were likely subject to a "conditions of confinement" standard of proof, which includes a state of mind element that would likely be challenged on the basis that defendants faced an extraordinary situation requiring extraordinary measures. The only relatively straightforward claim was the Vicinity sub-class, but regarding which there was the potential for considerable factual dispute.

### 2.    Class Actions Are Inherently Risky.

In addition, there are substantial risks in any class action. Most cases filed as a class action are not certified and many that are can still result in a loss, or in only a partial success. Thus, there is an added level of risk in any class action. See Litt Dec. ¶¶14 to 30.

### 3.    The Management of the Case was Challenging.

Although this was not a case that required extensive database management, a significant portion of the class membership in the case did not have stable addresses. Plaintiffs' counsel placed a high priority on maintaining contact with a large number of class members throughout the case, including monitoring and communicating on Occupy-related websites or other social media. As a result, plaintiffs' counsel expect that they will reach in the range of 90% of class members, a time intensive and laborious undertaking. In addition, plaintiffs' counsel spent many hours collecting and analyzing the information regarding which class members fit into what sub-classes; this was important to both certifying the sub-classes and to analyzing during settlement discussions how a potential recovery would be distributed, and whether it would be adequate.

### 4.      Reaching A Settlement Was Difficult.

Another example of complexity and risk, and counsel's skill, arose during settlement discussions. Plaintiffs' counsel gathered information regarding comparable settlements from all over the country, which was invaluable in ultimately reaching a settlement. While settlement was reached relatively early with the County after the grant of class certification, there were several delays regarding the City.  For a long time, it was uncertain whether or not the City case would settle. . There were several mediation sessions and, at the conclusion of the process, there was a mediator's proposal with the deadline to respond  being extended several times at the City's request. Thus, until the very conclusion, the outcome of mediation with the City was uncertain, and took approximately a year to resolve.

### B.    THE RISKS OF NON-PAYMENT WERE SUBSTANTIAL

There was substantial risk of non-payment facing plaintiffs' counsel. While the County had the resources to pay a judgment, the risk lay in establishing that the underlying conduct was illegal. This was discussed at some length in the previous section, and will not be repeated here. Seeking seven figure amounts of money from government entities always carries risks of politics entering into the equation.

Even though settlement was reached with a relatively small amount of litigation, the 25% fee plaintiffs are requesting will not even fully cover their lodestar, much less any risk enhancement. The lodestar is as low as it is only because plaintiffs' counsel are experienced in litigation of this type. Without such expertise, it is likely that the hours other counsel, even those experienced in civil rights litigation, would expend to accomplish the same result would substantially increase. Further, much of the preliminary work done to gather the relevant facts, which occurred pro bono during the initial arrest and release process, is not included in the lodestar although there is an argument that it should be.

Finally, civil rights cases such as this face particular challenges for class action

8

practitioners which are not present in other class litigation because policy or custom must be proven under *Monell*, and some deference is given to police in adopting appropriate tactics.

### C. THE EFFORT EXPENDED BY COUNSEL.

Including the investigation time, counsel litigated this case for nearly three years, excluding time spent on the initial arrests. The work performed included: 1) extensive investigation of the underlying circumstances, including communicating directly with many class members; 2) preparation of the complaint and amended complaint; 3) the Rule 26 conference and report; 4) extensive analysis of documents from a variety of sources, including public materials on the internet and from City Council files, documents obtained through a Freedom of Information Act request filed by the Partnership for Civil Justice, and social media; 5) a successful contested motion to certify the classes; 6) preparation of a mediation brief and multiple mediation sessions; 7) negotiation and preparation of extensive settlement documents, including settlement agreement, preliminary approval order, class notice and claim forms; 8) ongoing work with the Class Administrator, 9) yet to be done responses if objections are filed and proposed Final Approval Order, 10) Final Approval Hearing, and 11) continuing contact with class members offering information and assistance as requested. That description does not capture the full extent of the effort because, unlike many class actions, there was considerable individualized contact and communication with individual class members.

In addition, two intervenors opposed the class action and took their claims to the Ninth Circuit.

### D. THE RESULT OBTAINED FOR THE CLASS

This case was hard fought, as we have already described. The class members are people of little means. All work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered into only after plaintiffs won class certification. Even then it required approximately a year of settlement efforts.

The financial terms of the settlement are very favorable to class members. Every class member receives no less than $4000. Those who were bystanders and were arrested, or were held without OR – which is most class members – receive substantially more with a maximum possible recovery of over $10,000. These amounts are exclusive of attorneys' fees and costs.

The settlement compares well with other protest cases. The most comparable case is one involving arrests of people involved in protests over the shooting of Oscar Grant in Oakland, California. Participating class members in Oakland, who were arrested and held for 14 to 24 hours before being released in circumstances similar to the class here, received an average of approximately $4200. Here the average (referring to the mean) recovery, based on approximately a 90% participation rate, is in the neighborhood of $6500. See Dkt. 188 for elaboration regarding other protest and similar settlements.

### E.   COUNSEL'S EXPERIENCE

Class Counsel are highly experienced litigators in the fields of civil rights and class actions. The Court is familiar with all of them. All of the appointed class counsel are well-known and highly regarded civil rights lawyers, and all have extensive experience dealing both with civil rights and class action litigation. In addition, they are experienced in the area of protest civil rights class actions and other law enforcement class actions. In support of the class certification motion, extensive information regarding the qualifications of all class counsel was submitted to the Court, which demonstrated the exceptional qualifications of class counsel in this case. See Doc. #s 63, 64 and 65 (Sobel Declaration and CV, Litt Declaration with Litt and Hoffman CVs, and Stormer Declaration with list of awards attached).

### F.   COUNSEL'S SKILL

This issue has been answered by the discussion above. There can be little doubt that counsel in this case are highly skilled attorneys in the field of civil rights and civil rights class actions, particularly law enforcement class actions. The Court is in a position

to assess for itself the skill level of plaintiffs' counsel. We will not elaborate further.

>    **G.**   THE REACTION OF THE CLASS

As of the time of this writing, Plaintiffs' counsel has not yet received a final report of the number of claims, opt-outs, or objections filed. That information will be provided in connection with the final approval hearing. However, as of June 4, the Claims Administrator reports receiving 70 claims, two opt-outs, and no objections. Litt Decl., ¶ 57.

## IV.   THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS REASONABLE

In this case, plaintiffs' counsel seek an award of $687,500, plus costs. Costs are relatively modest, totaling approximately $30,000 including class administrator costs. The costs sought by plaintiffs' counsel as reimbursement totals only $5,608.93. It is well established in the Ninth Circuit that, while the court has discretion to use either a percentage of the fund or a lodestar approach in compensating class counsel (*see, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295 (9th Cir. 1994), the percentage of the fund is the typical method of calculating class fund fees. *E.g., Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1050 (9th Cir. 2002) ("the primary basis of the fee award remains the percentage method"). While most circuits leave the method used to the discretion of the trial court, "[m]ost federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes" *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 748 (S.D.Tex. 2008). Thus, we discuss the requested fee based upon that method. If the Court wishes to have lodestar information provided for any reason, we can do so although we consider it unnecessary in this case.

>    **A.**   THE PERCENTAGE OF THE FUND METHOD OF CALCULATING FEES IS THE BETTER METHOD TO CALCULATE FEES AND SUPPORTS THE FEE REQUEST HERE.

Class action litigation is risky by its very nature. In a Federal Judicial Center 1996

report, titled "Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules" ("FJC Report"), the Report authors studied the outcomes of four federal districts and concluded that 31.7% or less of the filed class cases resulted in successful class outcomes for plaintiffs. This does not account for the degree of success (i.e., some cases could have resulted in minimal or partial success, and they would still be in the successful claim category). Thus, an outcome such as that obtained in this case is the exception, not the rule. The FJC Report also examined the awarded fees and concluded that "attorneys' fees were generally in the traditional range of approximately one-third of the total settlement."

Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee, since the lodestar method does not reward early settlement."); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1266-67 & fn.3, 1271 (D.C.Cir.1993) (noting that the lodestar approach "encourages significant elements of inefficiency" by giving attorneys an "incentive to spend as many hours as possible" and "a strong incentive against early settlement"; the percentage approach "more accurately reflects the economics of litigation practice"; "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it influence the fee award"; accordingly, "we join the Third Circuit Task Force and the Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Camden I*

*Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) (holding in a reversionary common fund case "that the percentage of the fund approach is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."); Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534 (1998) (the percentage approach avoids numerous drawbacks of the lodestar approach and is preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class. Hence, under the percentage approach, the class members and the class counsel have the same interest -- maximizing the recovery of the class.").

Among the drawbacks to the lodestar method listed by Silber & Goodrich are that the lodestar method increases the amount of fee litigation; the lodestar method lacks objectivity; the lodestar method can result in churning, padding of hours, and inefficient use of resources; when the lodestar method is used, class counsel may be less willing to take an early settlement since settlement reduces the amount of time available for the attorneys to record hours; and the lodestar method inadequately responds to the problem of risk. *Id*. at pp.529-532. *See also Vizcaino*., 290 F.3d at 1050 ("it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee"); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679, 689-91 (M.D.Ala.1988) (cataloguing criticisms of the lodestar approach to fee calculation); *Manual for Complex Litigation* 4th Ed. §14.121 (2004) ("in practice, the lodestar method is difficult to apply, time consuming to administer, inconsistent in result, …capable of manipulation, …[and] creates inherent incentive to prolong the litigation").

Silber and Goodrich advocate that class fund fees should not diminish on a percentage basis, as some courts have done, because that undermines the full alignment between class counsel and the class. This is because, if the percentage of fees go down as

the size of the fund goes up, a substantial increase in the size of the fund may be only marginally beneficial to the class counsel while it may be extremely beneficial to the class, with the result being that the economic interests of the class and counsel become mis-aligned. They also reviewed two studies of fee awards in common fund cases. One study was the FJC Report discussed above. The other study, done by National Economic Research Associates, an economics consulting firm, in 1994, found that attorneys' fees in these class actions averaged approximately 32% of the recovery, regardless of the case size, and averaged 34.74% when the fees and expenses were added together. Silber and Goodrich, *supra,* at 545-546. Silber and Goodrich conclude with the observation that a 33% fee award is both reasonable, and in line with the general market for contingent fee work. *Id*. at 546-549.

While the Ninth Circuit has set a benchmark of 25% as a percentage of the fund, (*see Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990) (establishing benchmark percentage of 25% of the fund as normal class counsel percentage of fund award)), this is an across the board benchmark, which is often adjusted upward or downward depending upon the assessment of the results, and the size of the fund. In megafund cases, fees more commonly will be under the 25% benchmark in this Circuit. *See* Appendix in *Vizcaino*, 290 F3d 1043 (providing fees in megafund cases between $50 Million - $100 Million). In contrast, in cases under $10 Million, the awards more frequently will exceed the 25% benchmark, and indeed go above 30%. *See Van Vranken v. Atlantic Richfield Co*., 901 F.Supp. 294, 297 (N.D.Cal. 1995) ("the cases…in which high percentages such as 30-50 percent of the fund were awarded involved relatively smaller funds of less than $10 million"). Even in the cases cited in the *Vizcaino* Appendix, which are all megafund cases where the recovery exceeds $50 Million, half the cases resulted in a fee of 25% or more including *Vizcaino* itself, where the fee was 28% of a $97 Million fund, with a multiplier of 3.65.

It is well recognized that attorneys' fees should be aligned with those of the class,

which is best accomplished by awarding a percentage of the fund in the normal
contingent fee range. In this way, class counsel has an interest in maximizing the
recovery because a greater recovery directly benefits counsel as well as the class. In
defining a 'reasonable fee' in representative actions, the law should 'mimic the market.'
*Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) ("When a fee is set by a court rather
than by contract, the object is to set it at a level that will approximate what the market
would set.... The judge, in other words, is trying to mimic the market in legal services.").
Attorneys "regularly contract for contingent fees between 30% and 40%." *In re Remeron
Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, 16 (D.N.J. 2005)(citing cases),
making the requested fee highly reasonable in relation to the market for contingent fees.

The percentage figure here compares favorably with the general percentage of
recovery awarded in cases around the country. *See* Silber and Goodrich, *supra*
(summarizing available data and recommending that a 33% of the fund fee award is both
reasonable, and in line with the general market for contingent fee work); *In re Rite Aid
Corp. Securities Litigation*, 396 F.3d 294, 303 (3rd Cir. 2005), citing three studies ("[O]ne
study of securities class action settlements over $10 million ... found an average
percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class
actions resolved or settled over a four-year period ... found a median percentage recovery
range of 27-30%; and a third study of class action settlements between $100 million and
$200 million ... found recoveries in the 25-30% range were 'fairly standard.'") (citations
omitted).

There is little question that the 25% of the fund that plaintiffs' counsel are
requesting puts the fee request here at the lower end of settlements under $10 Million.
Further supporting the requested award is that none of the warning signs for a settlement
that may be influenced by improper favorable treatment of class counsel exists here. The
class was certified through a contested motion, not by agreement. Class counsel are not
receiving a disproportionate distribution of the settlement, the payment of fees is not

separated  from the class funds and therefore counsel cannot receive excessive fees in exchange for an unfair class settlement, and fees not awarded do not revert to defendants. *See, e.g., In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946-947 (9th Cir. 2011). Nor is this a settlement where portions of the class fund revert to defendants, and result in a highly disproportionate fee in relation to the actual (as opposed to theoretical) monetary recovery of the class. *See, e.g., Allen v. Bedolla*, __ F.3d __,  2015 WL 3461537 (9th Cir. June 2, 2015).

## B.  ALTHOUGH A LODESTAR CROSS-CHECK IS UNNECESSARY, IT MORE THAN SUPPORTS THE FEE REQUESTED HERE.

A lodestar cross-check is not required in this circuit, and, in a case such as this, is not a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc.*, 2007 WL 221862, 16 (N.D.Cal. 2007). In *Glass*, no lodestar cross-check was required by the Court where an early settlement resulted in exceptional results for the class even though some class members and the New York attorney general objected to the 25% of the fund request as excessive. As of the time of this writing, counsel in this case has received no objections to the settlement. Litt Decl., ¶ 57. The *Glass* Court awarded fees of $11,250,000 despite the fact that, in contrast to the situation here, the $45 Million fund was subject to a reversion for unclaimed funds so that the actual fund could end up being substantially less than the theoretical fund. Here, the fund is set, and will be fully distributed.

Because the requested fee is not based on the lodestar, we go into limited detail regarding the lodestar cross-check. As the Court explained in *Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-04149 MMM SHX, 2008 WL 8150856, at *9 (C.D. Cal. July 21, 2008):

> "In contrast to the use of the lodestar method as a primary tool for setting a fee award, the lodestar cross-check can be performed with a less exhaustive cataloging and review of counsel's hours. See *In re Rite Aid Corp. Sec Litig.*, 396 F.3d 294,

16

306 (3d Cir.2005) ('The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.'); *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir.2000) ('Of course, where [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized.'). All that should be required is sworn declarations from the attorney(s) in charge of billing records for the case attesting to (1) the experience and qualifications of the attorneys who worked on the case; (2) those attorneys' customary billing rates during the pendency of the case; and (3) the hours reasonably expended (reduced if necessary in the exercise of professional billing judgment) by those attorneys in prosecuting the case.").

We follow that approach here. Class Counsel seek a fee award of $687,500, plus an additional $5,608.93 for litigation costs. The estimated total attorney hours in the case through Final Approval of the settlement is 1050 or more. There will be approximately 85 paralegal hours in addition. See Declaration of Barrett S. Litt, ¶¶31-33. The average (mean) attorney lodestar rate based on the requested award of 25% of the class fund is approximately $630 per hour. The great bulk of the attorney time was expended by the four appointed class counsel (Sobel, Litt, Stormer, Hoffman) because the nature of the work required their direction participation. Even on the one contested motion – the class certification motion, on which Mr. Litt did much of the work – it was most cost effective for him to do that work because of his experience in that area and prior briefings on similar issues.

The four class counsel did over 70% of the attorney work on the case among them. Their average (mean) billing rate exceeds $900 per hour. See Declaration of Barrett S. Litt addressing awards, based on current billing rates, of $875-$1000 per hour for attorneys of the experience, skill and reputation of appointed class counsel. If this were a regular statutory fee motion seeking a lodestar award, the average rate of all attorneys who worked on the case would exceed $760 per hour (calculated by multiplying the

17

hours and current rate for each attorney, totaling them, and then dividing that total by the number of attorney hours to get an average hourly rate). However, the award plaintiffs' counsel are seeking (25% of the fund) yields an average hourly attorney rate of approximately $630, almost a 20% discount. If we were to use rates charged by lawyers of comparable skill, experience and reputation for complex commercial litigation, the average rate that would be sought in a statutory fee motion would substantially exceed both those figures. See Declaration of Barrett S. Litt, ¶¶47-52.

Thus, class counsel are not even receiving lodestar in this case, even though it had a very successful outcome and, as explained above, it would have been reasonable to seek a percentage of 30% or more. The expectation is that a successful class action will yield a premium above lodestar. *See, e.g.*, *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299-300 (9th Cir. 1994) ("Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose… 'If this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.'" ) (citations omitted). Multiples of five or more have been approved in class actions. See *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (multiplier of 5.2 in $25.5 Million settlement based on award of 25% of fund, identifying case with multiples of 19.6, 15.6, 15, 8.5, 7, 6.96, 6.2, 6, 5.61, 5.5, 5.3). Thus, the requested fee, which yields less than lodestar, is eminently reasonable.

Where plaintiffs' counsel obtain an expeditious and "excellent result" in a "complex and risky case", they are entitled to a fully compensatory award. *See Stop & Shop,* 2005 WL 1213926 (E.D.Pa.). We discussed the risks previously. While we would not classify this case as very high risk, there were meaningful risks related to liability and

18

class certification. The "skill and experience brought to bear by counsel throughout the year[s] they spent actively litigating this case, and the economy with which they were able to achieve such a noteworthy settlement" all speak to a substantial fee award. Further, "the award is justified by the high caliber of Plaintiffs' counsels' work in this case." *Stop & Shop*, *supra*. Whether measured by the percentage of the fund standard or the lodestar standard, the requested fees are reasonable.

## V. CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court award the class fund attorneys' fees and costs in the amount of $687,500 and costs of $5608.93.

Dated: June 5, 2015                    Respectfully Submitted,

                                       KAYE, MCLANE, BEDNARSKI & LITT
                                       LAW OFFICES OF CAROL SOBEL
                                       SCHOENBRON, DESIMONE, ET AL.
                                       HADSELL, STORMER & RENNICK

                                       By:__/s/ Barrett S. Litt_____
                                           Barrett S. Litt


                                       By:__/s/ Carol A. Sobel_____
                                           Carol A. Sobel
                                           Attorneys for Plaintiff

19