BARRETT S. LITT, SBN 45527
Email: blitt@kmbllaw.com
DAVID M. MCLANE, SBN 124952
Email: dmclane@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT
234 Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

CAROL A. SOBEL, SBN 84483
Email. carolsobel@aol.com
LAW OFFICE OF CAROL A. SOBEL
3110 Main Street, Suite 210
Santa Monica, California 90405
Telephone: (310) 393-3055
Facsimile: (310) 451-3858

Attorneys for Plaintiffs
ADDITIONAL COUNSEL NOT LISTED

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Cheryl Aichele, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>City of Los Angeles, et al.<br><br>Defendants. | Case No CV 12-10863- DMG-FFM (x)<br><br>[Honorable Dolly M. Gee]<br><br>DECLARATION OF BARRETT S. LITT IN SUPPORT OF PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS<br><br>Hearing Date: August 28, 2015<br>Hearing Time: 10:00 A.M.<br>Courtroom: 7<br><br>Trial Date: N/A<br>Time: N/A |

**DECLARATION OF BARRETT S. LITT**

I, Barrett S. Litt, declare as follows:

1.       This declaration is submitted in support of Plaintiffs' Motion for Fees and Costs. The facts set forth herein are within my personal knowledge or knowledge gained from review of the pertinent documents. If called upon, I could and would testify competently thereto.

## I.      BACKGROUND AND CIVIL RIGHTS/ATTORNEY FEE EXPERTISE

2.       I am an attorney duly licensed to practice in the State of California. Since 1984, I have been the principal or senior partner in firms that operate for the specific purpose of developing and maintaining a civil rights and public interest law practice that operates in the private sector on the basis of self-generated fee awards and other recoveries. Since January 1, 2013, I have been a partner in the law firm of Kaye, McLane, Bednarski & Litt (referred to at times as "KMBL").[1] Between September 2010 and December 31, 2012, I was a partner in the law firm of Litt, Estuar, and Kitson, which still operates to some extent as an independent firm to complete certain old cases. From July 2004 to September 2010, I was a partner in the law firm of Litt, Estuar, Harrison, and Kitson. From 1998 to July 2004, I was the principal in the law firm of Litt & Associates, Inc. From September 1, 1991 to May 1, 1997, when my then partner left the law firm to become Deputy General Counsel for Civil Rights at the federal Department of Housing and Urban Development, I was a partner at the firm of Litt & Marquez. For the seven years prior to that, I was a partner in the firm of Litt & Stormer, Inc.

3.       I graduated from the University of California at Berkeley in 1966 and from UCLA School of Law in 1969. For the first approximately ten years of

---

[1] Because this case was handled by Kaye, McLane & Bednarski before I became a partner with the firm, where it is relevant to refer to work at that stage, the designation "KMB" is used.

my practice, I focused primarily in the area of criminal defense at the trial and appellate levels, mostly in federal courts. In that capacity, I handled hundreds of matters, tried many cases ranging from immigration offenses to murders, and handled numerous appeals. Since 1981, I have focused primarily on complex civil litigation in the areas of constitutional law, civil rights law, class action litigation, and complex multi-party litigation.

4.     My former firm, Litt & Stormer, received the Pro Bono Firm of the Year Award from Public Counsel in 1987 in recognition of its public interest and civil rights work. Litt & Marquez received an award from the NAACP Legal Defense Fund in July, 1992, as civil rights firm of the year in recognition of its civil rights work. I received an award from UCLA School of Law as its public interest alumnus of the year in 1995 and received a CLAY award for my work in *Goldstein v. City of Long Beach et al.*, along with my co-counsel in the case, described in ¶12 *infra*.

5.     I have both spoken and written on the subject of civil rights training. I published an article entitled "Class Certification in Police/Law Enforcement Cases" in Civil Rights Litigation and Attorney's Fee Annual Handbook, Vol. 18, Ch. 3 (West Publishing 2002) and one for the National Police Accountability Project titled "Select Substantive Issues Regarding Class Action Litigation In The Jail/Prison Setting", National Police Accountability Project, October 2006. I published an article in the Los Angeles Lawyer regarding the use of minimum statutory damages under the Unruh Act, particularly actions brought under Civil Code §52.1, to enhance the prospects for certifying class actions. See "Rights for Wrongs," Los Angeles Lawyer December 2005. In 2010, I published an article in West's Civil Rights Litigation and Attorney's Fee Annual Handbook entitled, "Obtaining Class Attorney's Fees." I am rated "AV" by Martindale-Hubbell. I am, and have been for many years, listed in Super Lawyers Southern California in the fields of civil rights and class actions.

6.     My curriculum vitae is attached as Exhibit "A" to this declaration.

7.     I am considered an expert in, among other things, attorneys' fees in civil rights and class action cases. I have frequently trained attorneys regarding obtaining and properly documenting statutory attorneys' fee awards. I have filed declarations on numerous occasions expressing expert opinions on the appropriate standards for awards of attorneys' fees in civil rights cases, which have been accepted by the courts.

8.     In the State Bar proceeding *In re Yagman*, I was qualified as an expert in attorneys' fees under 42 U.S.C. §1988 and testified in person on whether or not Mr. Yagman's fee arrangement in a police shooting case was or was not unconscionable, as the State Bar contended in that case. I also recently testified in a State Bar proceeding as an expert on civil rights practice in the context of police and jail litigation.

9.     In 2007, I testified as an attorneys' fee expert in a civil rights case on behalf of plaintiffs represented by a major law firm in Los Angeles. The case had a confidential settlement, with fees to be arbitrated by a former superior court judge now at JAMS. Because the settlement and arbitration were confidential, I do not feel at liberty to identify the issues, parties, firms or retired judge involved. However, there was a defense fee expert in that case who described me as "a prominent Los Angeles civil rights litigator experienced in fee issues arising from public interest litigation." The arbitrator described my testimony as "credible and reliable", and described me as having "had a wide exposure to fees at a number of major firms in Los Angeles doing complex civil litigation."

10.     I have also on occasion represented other attorneys in their fee litigation seeking statutory attorneys' fees.

11.     I litigate a wide range of civil rights cases, including police and jail abuse, wrongful conviction, housing and employment and other discrimination, and violation of a wide range of constitutional rights. My current emphases are

civil rights class actions and wrongful convictions cases. I am currently lead or co-lead counsel in pending civil rights class actions in the Los Angeles area and in other jurisdictions, including Washington D.C., Maryland and Georgia.

12.     I have particular expertise in class actions and have published articles on attorneys' fees in class actions. As mentioned, my full curriculum vitae is attached. To give some sense of my experience, I mention here the largest civil rights cases in which I have been the, or one of the, lead counsel:

➢ *Williams v. Block*, Case No. CV97-03826 CW (C.D. Cal.) and related cases (a series of cases county jail overdetention and strip search cases, settled for $27 Million and a complete revamp of jail procedure;

➢ *McClure v. City of Long Beach* (fair housing case against City of Long Beach for preventing six group homes for the handicapped from opening; jury verdict before remittitur of $22.5 Million (exclusive of attorney's fees) rendered 8/04/04; case recently settled for $20 Million);

➢ *Craft v. County of San Bernardino*, EDCV05-0359 SGL (C.D. Calif.) (reported at 2008 U.S.Dist. LEXIS 27526) (certified class action against the Sheriff of San Bernardino County for blanket strip searches of detainees, arrestees, and persons ordered released from custody; partial summary judgment decided for plaintiffs; $25.5 Million settlement plus injunctive relief in 2008);

➢ *MIWON v. City of Los Angeles*, Case No.: CV07-3072 AHM (FMMx) (class action on behalf of demonstrators attacked by LAPD in MacArthur Park on May 1, 2007; settled in 2009 for $12.75 Million plus injunctive relief);

➢ *Bynum v. District of Columbia*, Case No. 02-956 (RCL) (D.D.C.) (certified class action against the District of Columbia for

overdetentions and strip searches of persons ordered released from custody, settled for $12 Million in 2006);

➢ *Gamino v. County of Ventura*, Case No. CV02-9785 CBM (Ex) (C.D. Cal.) (settlement for putative class fund of approximately $12 Million for persons arrested on possession of drugs and strip searched);

➢ *Goldstein v. City of Long Beach*, et al., Case No. CV04-9692 AHM (Ex) (C.D. Cal.) (wrongful conviction case against Long Beach Police Department based on violation of *Brady v. Maryland* for man imprisoned for 24 years; $7.95 Million settlement in August 2010);

➢ *Lopez v. Youngblood*, 609 F.Supp.2d 1125 ((E.D. Cal. 2009) (Settlement approved for putative class fund of approximately $7 Million for inmates strip searched after becoming entitled to release, and strip searches in groups);

➢ *Barnes v. District of Columbia*, Case 1:06-cv-00315-RCL 02-956 (RCL) (D.D.C.) (*Bynum* follow-up certified class action against the District of Columbia for overdetentions and strip searches of persons ordered released from custody, settled for $12 Million in 2006).

13.   My qualifications have been noted by various courts or opposing experts. Following are a few examples:

a.   Kenneth Moscaret, a well known defense fee auditor, recently stated in a declaration where he addressed my qualifications that I had "an outstanding background and reputation in civil rights/constitutional litigation in Los Angeles", that I was "one of the top litigators in [my] field" and that he believed that my "skill, experience, and reputation in his field are deserving of a premium rate" (although he thought a premium rate was lower than I do).

5

b.      Magistrate Judge Carla Woehrle, in awarding attorneys' fees in *Williams v. Block*, *supra*, commented that I am "considered one of the outstanding civil rights litigators in California, with special expertise in class actions, [and] the other attorneys involved in this litigation on behalf of the class are highly regarded, experienced and capable civil rights attorneys…"

c.      United States District Judge Stephen Larson, in awarding attorneys' fees in *Craft v. County of San Bernardino*, *supra*, commented that "Plaintiffs' counsel are experienced civil rights litigators who are at the top of their field of expertise – civil rights litigation with special expertise in civil rights class actions."

d.      United States District Judge Conseulo Marshall, in awarding attorneys' fees in *Gamino v. County of Ventura*, Case No. CV02-9785 CBM (Ex), stated, "Mr. Litt is widely known as one of the foremost civil rights attorneys in California, having a particular expertise in civil rights class actions and other complex multi-party civil rights cases, especially law enforcement class actions."

e.      In a case in state Court, where I submitted a declaration in support of a fee motion, Judge Gregory W. Alarcon described another attorney and me as "acknowledged experts in attorney fees in class action cases . . . ." *Molina v. Lexmark International Inc.*, LA Super. Ct. No. BC339177, Order Granting Plaintiff's Motion for Attorney's Fees and Costs in the Amount of $5,772,008.07, filed Oct. 28, 2011 at 4.

f.      United States District Judge Conseulo Marshall, in awarding attorneys' fees in *Rodriguez et al. v. County of Los Angeles et al.,* CV 10-6342-CBM (AJWx) (12/27/2014), stated, "Barrett S. Litt…is considered one of the leading civil rights attorneys in the country."

6

## II.    CLASS ACTION CONSIDERATIONS IN SETTING A FEE AWARD.

14.    As the Court is aware from previous filings in this case (see Doc. 188), the results in this case compare favorably with other protest settlements. The factors supporting a full fee in this case are set out in the Memorandum of Law, and will not be repeated here. This was a risky case for Plaintiffs' counsel for several reasons.

a.    Plaintiffs' counsel took this case on a purely contingent fee basis and, had they been unsuccessful, they would have received no compensation.

b.    At the time Plaintiffs took this case, Defendant denied any liability or wrongdoing of any kind and further contended that their actions were fully justified.

c.    Plaintiffs' counsel took the risk that the case may not have been certified as a class action lawsuit. In any class action, this is a risk as is discussed in depth further on. Generally speaking, there is always substantial risk regarding whether a damages class will be certified because Plaintiffs must prove that common issues predominate and that the class action is manageable.

d.    The stakes in class action litigation are high, and Defendants often have a greater financial stake in fighting the case than in individual liability cases. The legal issues are usually complex and subject to substantial dispute. Similarly, establishing the facts often requires significant discovery and analysis. Discovery disputes are commonplace and class action litigation often involves a substantial number of contested motions (although, as it turned out, this one did not). Even where a case is litigated very efficiently, it is rare that a class action is resolved without a least a couple of thousand hours being put into it, and often more. In the rare

situation where a case is resolved without intensive litigation, it means that class counsel have been successful in obtaining an early resolution, which greatly benefits the class by obtaining expeditious relief for the class. In this case, the relief was both fast and substantial. (I distinguish this situation from one where the class relief is minimal and of limited economic value, so called "coupon settlements," which often resolve quickly but without meaningful relief to the class. Here, there is a very substantial monetary recovery for the class, and it was obtained relatively expeditiously.) Discovery was relatively limited in large part because of the extensive investigation conducted independently by class counsel.

e.      Where early resolution does not occur, the same case could result in thousands of hours and extensive costs being invested before any resolution. In this case, Plaintiffs' lodestar actually exceeds the requested contingency fee.

f.      Had this case not been successfully resolved, Plaintiffs' counsel would have been responsible to litigate it to conclusion, including possibly trying the case. This may have entailed a long trial, with testimony from a sample of Class Members, numerous LAPD and LASD representatives, other witnesses, and experts.

g.      As detailed in the settlement agreement submitted as an exhibit to the preliminary approval order, class counsel obtained very substantial relief for individual class members.

h.      Class counsel are highly skilled and experienced litigators, including litigating class action cases, as is demonstrated by their declarations in support of the motion for class certification demonstrating the depth of experience they have in this field. Such experience and skill manifests itself in many ways that are not self-evident, here most clearly by

8

their ability to obtain an outstanding settlement for class members relatively quickly.

15.     The substantial nature of the settlement is supported by the fact that there have been no objections to the settlement as of the filing of this Motion and that there are very few opt-outs from the settlement, none of which expressed dissatisfaction with the settlement. Courts frequently look to the reaction of the class members to determine whether the settlement is a favorable one for the class. E.g., *5 Moore's Federal Practice*, §23.85[2][d] (Matthew Bender 3d ed.) (the "reactions of the members of a class to a proposed settlement is a proper consideration for the trial court"); *National Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D.Cal. 2004) ("the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

16.     I provide here just one example of how cases can end up taking far longer than initially anticipated (just as this one ended up taking less time than is typical). For the past 16 years, I have been lead counsel in a class action against the California Department of Corrections and Rehabilitation for using backscatter x-rays routinely on visitors (*Wisely v. State of California*). Over 10,000 hours went into litigating that case only, on the eve of trial, to have the defense announce that it had voluntarily and permanently abandoned use of such machines for reasons unrelated to the litigation, and to have the damages claims dismissed on immunity grounds. When we filed the case, the information we had was that anyone scanned who showed a potential secreted item was subjected to a physical strip search. However, this turned out not to be so, which totally changed the character of the litigation. For complicated procedural reasons, the appeal in the case was only resolved this year, and the matter has been remanded for further proceedings. Although there was a stipulated injunction, the motion for attorneys'

9

fees on the injunction will not be heard until damages issues are resolved, after which another appeal is likely on any attorneys' fee motion on the injunction. The outcome of that fee motion is subject to considerable dispute. The point of my raising this is that there are substantial risks in litigation of this type when it is entered. Some go well; some do not. When they do go well, counsel should receive full compensation, for when they do not, it is counsel that bears the cost.

### A.   THE RISK OF NON-RECOVERY IN CLASS ACTIONS IS WELL DOCUMENTED.

17.     That there is substantial risk of non-recovery in class action litigation is not just a matter of my personal opinion. The Federal Judicial Center published a report in 1996, entitled "Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules" ("FJC Report").[2] The study was requested by the Judicial Conference Advisory Committee on Civil Rules when it was considering proposals to amend Rule 23 of the Federal Rules of Civil Procedure. The study is based on 407 class action lawsuits that either settled or went to verdict in the two year period from July 1, 1992 through June 30, 1994, in four federal district courts: the Eastern District of Pennsylvania (Philadelphia); the Southern District of Florida (Miami), the Northern District of Illinois (Chicago); and the Northern District of California (San Francisco). (FJC Report, pp. 3-4, 7-8.)

18.     For the 407 class actions, the Report reports the following regarding class certification:

a.     In 59 of the cases (14.5%), the class claims were certified for settlement purposes only. *Id*. at p. 35.

b.     In 93 of the cases (22.85%), the class claims were certified unconditionally. *Id*.

---

[2] A copy of the Study is located at https://bulk.resource.org/courts.gov/fjc/rule23.pdf.

10

c.  Therefore, a total of 152 cases (37.35%) had certified classes, and the other 255 (62.65%) did not. *Id.*

d.  In at least 23 of the certified classes, the outcome was unfavorable to Plaintiffs. This is based on Table 39 of the FJC Report (at p. 179), which lists the following outcomes adverse to plaintiffs in certified class cases (excluding classes certified for settlement purposes only): nine dismissals by motion, one stipulated dismissal, one non-class settlement, and twelve summary judgments. *Id.* at p. 179, Appendix C, Tables 39.

19.  Thus, in summary, the successful class claims from the total 407 filed class actions totaled 129 or less (152 minus 23). Using the number 129/407 to get a percentage, 31.7% or less of the filed class cases resulted in successful class outcomes for plaintiffs. This does not account for the degree of success (i.e., some cases could have resulted in minimal or partial success, and they would still be in the successful claim category).

20.  The Empirical Study also examined "the 'cynical belief' that 'many class actions serve only to confer benefits on class counsel.'" (*Id.* at p.68.) To do so, the recovery of attorneys' fees by class counsel was compared to the relief obtained for the class "where some form of monetary benefit was available for distribution to class members after payment of attorneys' fees and expenses, notice costs and other administrative expenses." (*Id.*) The Report found that:

> "In most cases, the net monetary distribution to the class exceeded attorneys' fees by substantial margins. The fee-recovery rate infrequently exceeded the traditional 33.3% contingency fee rate. Median rates ranged from 27% to 30%. Most fee awards in the study were between 20% and 40% of gross monetary settlement." (*Id.* at pp. 68-69; citation and footnote omitted.)

21.  The Report then concluded, "[W]e found that attorneys' fees were generally in the traditional range of approximately one-third of the total

11

settlement. While attorneys clearly derived substantial benefits from settlements, the recoveries to the class in most cases were not trivial in comparison to the fees." (*Id.* at p.90.)

### B.   PLAINTIFFS' REQUEST FOR PERCENTAGE OF THE MAXIMUM SETTLEMENT AMOUNT.

22.   I am very familiar with the market expectation for large contingent fee cases. The market expectation for class action cases is that counsel will fully participate in the benefit they create for the class. This involves a percentage of the recovery for the class, usually in the range of 25% on the low side to 40% on the high side. In mega-fund cases (which are defined differently by different courts, but are by any measure over $50 Million) the low end percentage may go below 25%. In cases between $25-$50 Million, the range of 25% or somewhat higher is common, but in cases under $25 Million, such as this one, fee awards of 33% reflect the common market expectation.

23.   Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner. *See, e.g., Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1266-67 & fn.3, 1271 (D.C.Cir.1993) (noting that the lodestar approach "encourages significant elements of inefficiency", by giving attorneys an "incentive to spend as many hours as possible" and "a strong incentive against early settlement"; the percentage approach "more accurately reflects the economics of litigation practice", and "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it influence the fee award"; accordingly, "we join the Third Circuit Task Force and the Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in

common fund cases"); *Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) (holding in a reversionary common fund case "that the percentage of the fund approach is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."); Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534 (1998) (the percentage approach avoids numerous drawbacks of the lodestar approach and is preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class. Hence, under the percentage approach, the class members and the class counsel have the same interest -- maximizing the recovery of the class.")[3]. *See also Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1050 (9th Cir. 2002) ("the primary basis of the fee award remains the percentage method").

24.     Among the drawbacks to the lodestar method listed by Silber & Goodrich are that the lodestar method increases the amount of fee litigation; the lodestar method lacks objectivity; the lodestar method can result in churning, padding of hours, and inefficient use of resources; when the lodestar method is used, class counsel may be less willing to take an early settlement since settlement reduces the amount of time available for the attorneys to record hours; and the lodestar method inadequately responds to the problem of risk. *Id*. at pp.529-532. *See also Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1050 (9th Cir. 2002) ("it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee"); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp.

_____

[3] A copy of the Silber & Goodrich article is available on Westlaw and, I believe, Lexis.

679, 689-91 (M.D.Ala.1988) (cataloguing criticisms of the lodestar approach to
fee calculation); *Manual for Complex Litigation* 4th Ed. §14.121 (2004) ("in
practice, the lodestar method is difficult to apply, time consuming to administer,
inconsistent in result, ...capable of manipulation, ...[and] creates inherent
incentive to prolong the litigation").

25.     Silber and Goodrich advocate that class fund fees should not
diminish on a percentage basis, as some courts have done, because that
undermines the full alignment between class counsel and the class. This is
because, if the percentage of fees go down as the size of the fund goes up, a
substantial increase in the size of the fund may be only marginally beneficial to
the class counsel while it may be extremely beneficial to the class, with the result
being that the economic interests of the class and counsel become mis-aligned.
They also reviewed two studies of fee awards in common fund cases. One study,
done of four districts in 1996 by the Federal Judicial Center, found that most fee
awards in common fund class actions were between 20% and 40% of the gross
monetary settlement, with little variation between districts. The other study, done
by National Economic Research Associates, an economics consulting firm, in
1994, found that attorneys' fees in these class actions averaged approximately
32% of the recovery, regardless of the case size, and averaged 34.74% when the
fees and expenses were added together. *Id*. at 545-546. Silber and Goodrich
conclude with the observation that a 33% fee award is both reasonable, and in line
with the general market for contingent fee work. *Id*. at 546-549.

26.     It is well recognized that the attorney's fees should be aligned with
those of the class, which is best accomplished by awarding a percentage of the
fund in the normal contingent fee range. In this way, class counsel has an interest
in maximizing the recovery because a greater recovery directly benefits counsel
as well as the class. In defining a reasonable fee in representative actions, the law
should "mimic the market." *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir.

14

1998) ("When a fee is set by a court rather than by contract, the object is to set it at a level that will approximate what the market would set.... The judge, in other words, is trying to mimic the market in legal services."). Attorneys "regularly contract for contingent fees between 30% and 40%." *In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, 16 (D.N.J. 2005)(citing cases), making a 33 1/3% figure highly reasonable in relation to the market for contingent fees. Thus, the fact that Plaintiffs' counsel have limited their fee request to 25% of the fund reinforces its reasonableness.

27.    It is well established that it is appropriate to award class fund attorneys' fees based on the gross settlement fund (inclusive of administrative costs and attorneys' fees). Herbert B. Newberg and Alba Conte, *Newberg on Class Actions* §14.6 (4th Ed. 2007 update) ("[i]n *Boeing Co. v. Van Gemert*, [444 U.S. 156, 100 S. Ct. 745 (1980)] the Supreme Court settled this question [of whether class fund fees are based on the gross settlement or net settlement funds actually claimed] by ruling that class counsel are *entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed*") (emphasis supplied); *Williams v. MGM-Pathe Commun. Co.,* 129 F.3d 1026 (9th Cir.1997) (reversing award of attorneys' fees because trial court failed to base fee award on the entire settlement, rather than the amount claimed); *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295 (11th Cir.1999) (distribution of attorneys' fees are to be based upon the funds available to eligible claimants, whether claimed or not; affirming a fee award nearly twice the amount actually claimed by the class from the fund); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2nd Cir. 2007) (the "entire Fund… is created through the efforts of counsel at the instigation of the entire class"; an "allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not"). I note that in this case there

15

is little difference between the net and the gross here because over 82% of the available funds have been claimed.

28.     Although not applicable here because this is a class fund, not a claims made settlement, it is well established that one important purpose of the class action device is that Defendants should not benefit from their wrongdoing, and should be deterred from doing so by being vulnerable to class actions to remedy their wrongful conduct. *See, e.g* Richard A. Posner, *Economic Analysis of Law* 626-27 (5th ed. 1998) ("the most important point from an economic standpoint is that the violator be confronted with the costs of his violation – this achieves the allocative purpose of the suit – not that he pays them to his victims"); John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation,* 2-3 (Columbia Law. Sch. Ctr. for Law & Econ. Studies, Working Paper No. 293, 2006) (available at http://ssrn.com/abstract_id =893833 ("[d]eterrence... is the only rationale that can justify the significant costs--both public and private--that securities class actions impose on both investors and the judiciary"). Through the deterrence prism, if the choice is between proposed attorney's fees reverting to the defendant and being paid to the attorneys who created the fund, both equity and deterrence are far better served by paying the funds to the attorneys. As recent commentators have observed, if the economic interests of the class and counsel are mis-aligned, class counsel lose the incentive to maximize the benefit to the class because they do not participate, or do not fully participate, in the benefit of the larger recovery. *See, e.g*., Myriam Gilles, *Exploding The Class Action Agency Costs Myth: The Social Utility Of Entrepreneurial Lawyers*, University of Pennsylvania Law Review, 155 U. Pa. L. Rev. 103 (November 2006).

**C.     PERCENTAGE OF THE AVAILABLE FUND AWARDS ARE PARTICULARLY APPROPRIATE IN EARLY SETTLEMENTS.**

29.     It has been noted that percentage of the available fund awards are particularly well suited where there is an early settlement of a class action. Judge Marilyn Hall Patel carefully analyzed fee awards in *In re Activision Securities Litigation,* 723 F.Supp. 1373 (N.D.Cal.1989). In that case, Judge Patel elucidated the problems caused by the lodestar approach and explained why a percentage of the fund was particularly well suited for early settlements: "Most important, however, is the effect the process has on the litigation and the timing of settlement. Where attorneys must depend on a lodestar approach there is little incentive to arrive at an early settlement." *Id.* at 1375. Accordingly, Judge Patel concluded that a percentage award was the better practice and that the typical percentage should be 30%:

> "Therefore, this court concludes that in class action common fund cases the better practice is to set a percentage fee and that, absent extraordinary circumstances that suggest reasons to lower or increase the percentage, the rate should be set at 30%. This will encourage plaintiffs' attorneys to move for early settlement, provide predictability for the attorneys and the class members, and reduce the time consumed by counsel and court in dealing with voluminous fee petitions." *Id.* at 1378.

30.     Numerous courts have explained that class counsel should be fully awarded percentage of the fund fees where there is an early settlement that is in the interests of the class. *See, e.g., Lealao v. Beneficial California, Inc.,* 82 Cal.App.4th 19, 28-29, 97 Cal.Rptr.2d 797, 805 (Cal.App. 1 Dist. 2000) (lodestar method, among other things, "encourages lawyers to expend excessive hours, and ... engage in duplicative and unjustified work," "creates a disincentive for the early settlement of cases," and deprives trial courts of "flexibility to reward or deter lawyers so that desirable objectives, such as early settlement, will be fostered", quoting *Report of the Third Circuit Task Force, Court Awarded Attorney Fees,* 108 F.R.D. 237, 246-249 (1985); *Glass v. UBS Financial Services, Inc.,* 2007 WL 221862, 16 (N.D.Cal. 2007) (25% of the $45,000,000 reversionary

fund awarded; "Class counsel's prompt action in negotiating a settlement …
should be fully rewarded"; no lodestar cross check conducted or needed*)*
(emphasis supplied); *Kirchoff v. Flynn,* 786 F.2d 320, 325-26 (7th Cir.1986)
("The contingent fee uses private incentives rather than careful monitoring to
align the interests of lawyer and client. The lawyer gains only to the extent his
client gains.... The unscrupulous lawyer paid by the hour may be willing to settle
for a lower recovery coupled with a payment for more hours. Contingent fees
eliminate this incentive and also ensure a reasonable proportion between the
recovery and the fees assessed to defendants.... At the same time as it
automatically aligns interests of lawyer and client, rewards exceptional success,
and penalizes failure, the contingent fee automatically handles compensation for
the uncertainty of litigation."); *In re M.D.C. Holdings Securities Litigation*, 1990
WL 454747, 8 (S.D.Cal.,1990) ("[T]he results reached here were accomplished in
a remarkably short period of time. It is my strong belief that in general the actual
amount of recovery, if any, which ultimately goes to plaintiffs in the majority of
cases is inversely proportional to the time spent in litigation....¶ And finally,
concluding litigation quickly and with a fair result is beneficial to the general
public in that it frees the resources of the courts to deal with other matters.")
(quoting another court); *Report of the Third Circuit Task Force, Court Awarded
Attorney Fees,* 108 F.R.D. 237, 246-249 (1985) (lodestar method needlessly
increases judicial workload, creates disincentive for early settlement, and causes
unpredictable results); *Mashburn v. National Healthcare, Inc*., 684 F.Supp. 679,
695 (M.D.Ala.1988) ("[o]ne of the reasons for supporting a percentage fee award
is to encourage early settlement of cases, " citing H. Newberg, *Attorney Fee
Awards,* §2.07 at 48-51).

## III.   SOURCE MATERIALS RELIED ON FOR LODESTAR CROSS-CHECK

31.    In this case, Plaintiffs provide a summary lodestar cross-check to further support the reasonableness of the fee being requested. As is explained in the accompanying Memorandum of Law, the requested fee here represents about 80% of Plaintiffs' lodestar. The estimated total attorney hours in the case through Final Approval of the settlement is 1050 or more. There will be approximately 85 paralegal hours in addition. The blended attorney lodestar rate based on the requested award of 25% of the class fund) is approximately $630 per hour. The great bulk of the attorney time was expended by the four appointed class counsel (Sobel, Litt, Stormer, Hoffman) because the nature of the work required called for their direction participation. Even on the one contested motion – the class certification motion – on which Mr. Litt did much of the work, it was most cost effective for him to do that work because of his experience in that area and prior briefings on similar issues.

32.    The four class counsel did over 70% of the attorney work on the case among them. The table below summarizes the time (projected through Final Approval) of the attorneys and paralegals in the case. The four appointed counsel have approximately 735 hours; the other attorneys (including Nick Hartman, see Fn. 1), have slightly over 300 hours.

| Biller | Hours |
|---|---|
| APPOINTED CLASS COUNSEL | |
| Carol Sobel | 380 |
| Barrett S. Litt | 250 |
| Paul Hoffman | 59.7 |
| Dan Stormer | 45.5 |
| OTHER COUNSEL | |

| Biller | Hours |
|---|---|
| Nick Hartman | 135[4] |
| Lincoln Ellis | 122 |
| Dave McLane | 20 |
| Catherine Sweetser | 16.4 |
| Colleen Flynn | 10.2 |
| Lindsay Battles | 0.8 |
| Josh Povia Scott | 0.7 |
| **OTHER COUNSEL** | |
| Robert Kitson | 0.5 |
| Stacey Brown | 0.3 |
| Paul Estuar | 0.5 |
| **PARALEGALS** | |
| Julia White | 70 |
| Esteban Gil | 0.9 |
| Rose Ruiz | 2.4 |
| Mary Ross | 1.5 |
| Paloma Hoehr | 10 |
| Haleen Shanbhag | 2.5 |
| Tami Gilindo | 6.9 |

33.     In approximate numbers, this comes to 1050 attorney hours and 85 paralegal hours.

34.     The average (mean) current billing rate of the four class counsel, whose years of experience range from 37 to 46 years, exceeds $900 per hour.

---

[4] Nick Hartman, now an attorney, was a law student when he worked on the case. While the hourly rate used for him to calculate lodestar is that of a law student, he is included in the tally of attorney hours.

Below I provide ample support in various tables for rates of $875-$1000 or more for attorneys of their skill, experience and reputation. Those tables include fee awards, adjusted for the passage of time, of such rates. If just these four counsel's normal rates were paid, that amount would cover virtually the whole amount being requested.

35.     Based on the rates that would be sought were this a normal fee motion, the blended rate of the attorneys who worked on the case would exceed $760 per hour, but the blended rate, based on the requested fee, is only approximately $630, almost a 20% discount. If we were to use rates charged by lawyers of comparable skill, experience and reputation for complex commercial litigation, the attorney rates would substantially exceed the $900 mean number used for the four most experienced counsel.

36.     I have regularly brought fee motions under numerous federal and state fee shifting provisions. I frequently provide fee declarations in support of fee applications by other attorneys in civil rights cases, which have been cited in fee orders in the Central District to support fees that are in line with those that counsel for the Plaintiffs are seeking in this case. See, e.g., *Rauda v. City of Los Angeles*, CV08-3128 CAS (PJW), Fee Order dated 12/20/2010, p.10 ("With respect to the reasonableness of the fees requested, the Court finds that plaintiffs have sufficiently documented the fees requested. It further concludes, and is satisfied based on the declarations of Barrett S. Litt and Carol A. Sobel in support of plaintiffs' motion that the hourly rates requested by plaintiffs are consistent with those in the relevant legal community for individuals having the stature of plaintiffs' counsel."); *Lauderdale v. City of Long Beach*, No. CV 08-979 ABC (JWJx), Fee Order dated 1/11/2010, p.11 ("Barrett S. Litt, another experienced civil rights litigator, also testified that the rates are in line with the Southern

California market, his own experience, and fee awards in similar cases. (Litt Decl. ¶¶26–31.)").

37.   The rate information on which I rely is set forth in full in Exhibit B to this Declaration, which is incorporated by this reference and is broken into three tables, described as follows:

> ➢ Table 1: *Civil Rights Lodestar Awards/Lodestar Crosschecks*. These are taken from reported attorney fee awards, or filed court orders, in civil rights cases where there was either a direct lodestar award or a lodestar crosscheck against a percentage of the settlement or award fee.

> ➢ Table 2: *Consumer/Wage & Hour Class Action Lodestar Crosschecks*. This is self-explanatory, and was taken from reported cases.

> ➢ Table 3: *Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports*. These are a firm's standard rates reported either in a court filing, referred to in a court decision, provided to counsel, or contained in the 2009 Court Express summary of bankruptcy filings referred to previously.

38.   All of the rates sought in this case are well within the rates charged by attorneys of comparable experience in the Southern California area for complex civil rights work. Below I address the rates sought in this case, and compare them to attorneys of comparable or lesser experience, skill and reputation seeking or charging comparable or lesser rates. In the charts that I attach as Exhibit B, and incorporate as relevant into the body of this Declaration, I provide the following information:

| Term | Description |
|------|-------------|
| Attorney | The name of the attorney awarded the rate listed or, for the commercial firms, their normal rates (or indicate if the individual identity is unknown) |
| Firm | The firm listed |
| Practice Yrs | The years in practice at the time of the award or, if it could be clearly determined from the opinion or other available information, the years in practice when the fee application was made. In parentheses are the years of law school graduation |
| Rate | The rate awarded in the case of awards, or normally charged for commercial firms |
| Year | The year of the award or the year of the fee application if those rates were used. |
| Adjusted Rate | An adjustment to the fee award to compensate for the passage of time, the basis for which is described in ¶¶ 20-27 below. |
| SuperLawyer | Whether the attorney listed is currently listed as a SuperLawyer, the reason for which is described in ¶28 below. |

39.  The name of the case in which the fee was awarded or, for commercial rates (where applicable) filed for, is noted by the use of a superscript number next to the name of the attorney. At the conclusion of the first set of charts in Exhibit B (and incorporated as relevant if the reference is used in the body of this Declaration), the name and case number, and/or Westlaw cite of the case is listed if the source is from a public filing. If the source is not from a public filing, the non-public source is identified and/or attached. Cases not in Westlaw,

documents from a case file, and non-public documents relied upon (with the exception of Court Express) that are referenced by a superscript number are attached with a designated Exhibit Number (which number matches the superscript number).[5] If the case is in Westlaw, it is not attached.

40.    As explained in the fee motion, if counsel were bringing a traditional statutory attorney's fee motion, the range of requested rates for the four appointed class counsel would be in the $875-$1000 range (although, for reasons  also explained in the motion and previously, that is not what the fee actually being requested yields). Nonetheless, as a check on the reasonableness of the requested fee, below I show rates for attorneys of comparable or lesser experience, skill and reputation. In the charts that I attach as Exhibit B, and incorporate as relevant into the body of this Declaration, I provide the information explained in the following paragraphs.

41.    The name of the case in which the fee was awarded or, for commercial rates (where applicable) filed for or charged, is noted by the use of a superscript number next to the name of the attorney. At the conclusion of the first set of charts in Exhibit B (and incorporated as relevant if the reference is used in the body of this Declaration), the name and case number, and/or Westlaw cite of the case is listed if the source is from a public filing. If the source is not from a public filing, the non-public source is identified and/or attached. Cases not in Westlaw, documents from a case file, and non-public documents relied upon (with the exception of Court Express) that are referenced by a superscript number

---

[5] So, for example, if the superscript uses the number "81" to designate the case, then the exhibit, if attached, will be Exhibit 81. It will be attached if it is a non-public source or a court order not available on Westlaw.

24

are attached with a designated Exhibit Number (which number matches the superscript number).[6] If the case is in Westlaw, it is not attached.

42.     The "Adjusted Rate" is an inflation adjustment so that what that rate would be in 2014, adjusted for the passage of time. As is explained further below, the starting point for this adjustment is the mean (numerical average) of the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor, which is reproduced by Dr. Michael Kavanaugh in his website for the "Updated Laffey Matrix." The "Updated Laffey Matrix" has been cited, and relied on, by courts in D.C.[7].

43.     To adjust for inflation/rise in the cost of legal services, I began with the average of the Legal Services CPI for the ten years 2005-2015, which came to 3.7%. See http://www.laffeymatrix.com/see.html. On the one hand, these figures are not representative of a city such as Los Angeles, which is one of the most expensive legal markets (and places to live) in the country. The cost of living in Los Angeles is 50% above the national average. http://www.payscale.com/cost-of-living-calculator/California-Los-Angeles. According to one source, Los

---

[6] So, for example, if the superscript uses the number "81" to designate the case, then the exhibit, if attached, will be Exhibit 81. It will be attached if it is a non-public source or a court order not available on Westlaw.

[7] *See Salazar v. Dist. of Columbia*, 123 F. Supp. 2d 8, 13 (D.D.C. 2000); *Smith v. Dist. of Columbia*, 466 F. Supp. 2d 151, 155 (D.D.C. 2006) (the use of the updated *Laffey* Matrix is reasonable and consistent with previous precedent from our Court of Appeals, as well as from this Court in *Salazar*" and is "more accurate in that the calculation was based on increases/decreases in legal services rather than increase/decreases in the entire CPI"); *McDowell v. District of Columbia*, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001) ("Plaintiffs may point to such evidence as an updated version of the Laffey matrix"); *Salazar v. Dist. of Columbia*, 750 F. Supp. 2d 70, 72 (D.D.C. 2011) (affirming use of the adjusted rate based on the national legal services data for monitoring work in the case, and rejecting Defendant's contention that the United States Attorney's matrix should be used instead).

Angeles is the most expensive city in the country in which to live well, followed by San Francisco and New York, which were tied.

http://www.huffingtonpost.com /2013/07/17/la -most-expensive-city_n_3612567.html. Whether that report is correct or not, it is beyond dispute that Los Angeles, along with San Francisco and Los Angeles, is one of the three most expensive living areas in the country.

44.     That Los Angeles is a special case in terms of cost of living is confirmed by the fact that the federal government, which adjusts pay for the same grade based on a cost of living adjustment keyed to the area in which a federal employee lives and works (referred to as locality pay), makes the highest adjustment for the three areas of Los Angeles, San Francisco and New York. See http://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2012/general-schedule/. Judicial salaries are similarly adjusted. See http://www.uscourts.gov/Careers/Compensation.aspx.

45.     Other information indicates that fees in major metropolitan markets will likely have risen more rapidly than the national average. For example, the Wall Street Journal reported in April 2013, that, in "the first quarter of 2013, the 50 top-grossing U.S. law firms boosted their partner rates by as much as 5.7%, billing on average between $879 and $882 an hour" and that, in 2012, "legal fees in general rose 4.8% and associate billing rates rose by 7.4%, according to a coming report by TyMetrix Legal Analytics, a unit of Wolters Kluwer, WKL.AE -0.57% and CEB, a research and advisory-services company. Those numbers are based on legal-spending data from more than 17,000 law firms." See "On Sale: the $1,150-Per-Hour- Lawyer", WSJ, April 9, 2013,

http://online.wsj.com/news/articles.[8] These figures are considerably higher than the 3% inflation factor.

46.    On the other hand, the national average over the last 10 years is not reflective of the rise in rates over more recent periods. For example, over the last 8 years, the national average legal CPI comes to approximately 3.5%, and over the last five years, it comes to approximately 3.3%. Without going into detail, I ended up using an annual inflation factor of 3.24%, which is a conservative figure and does not account at all for the likely higher inflation in Los Angeles.

47.    A recent fee award discussed the range of rates at the country's largest firms, based on the NLJ Survey, which I provide below in order to demonstrate that the *average* rates for commercial work at large firms are considerably above the rates awarded even the top civil rights attorneys even though complex civil rights litigation is well on a par with other complex litigation. In *Xu v. Yamanaka*, No. 13-CV-3240 YGR, 2014 WL 3840105, at *4 (N.D. Cal. Aug. 1, 2014, the Court provided the following table of rates:

| Firm | Number of Attys | Partner Range | Partner Average | Associate Range | Associate Avg. |
|------|-----------------|---------------|-----------------|-----------------|----------------|
| Weill Gottschall | 1220 | | $927 (2012) | $450–790 | $581 (2012) |
| Citibank Data | | | $997 (2012) | | $597 (2012) |
| Latham & Watkins | 2033 | $895–1110 | $990 | $465–725 | $605 |

---

[8] See also, e.g., "Top Law Firms Still Tops in Rates, Billable Hours", Hildebrandt Institute, January 10, 2013, 22.    http://hildebrandtblog.com/2013/01/10/top-law-firms-still-tops-in-rates-billable-hours: "A survey from The National Law Journal (NLJ) (registration required) found that median partner rates were up 4.5 percent from 2011 to $517 an hour in 2012, and the median associate rate rose 3.5 percent to $323, with hourly rates ranging from $130 to $1,285 and a median hourly rate of $432. This gibes with the findings of the Major Lindsey & Africa (MLA) "Partner Compensation Survey 2012," which recorded an average hourly rate increase from $555 to $584 between 2010 and 2011, which is an increase of over 5%.

| Firm | Number of Attys | Partner Range | Partner Average | Associate Range | Associate Avg. |
|---|---|---|---|---|---|
| Paul Weiss | 803 | $760–1120 | $1040 | $250–760 | $600 |
| Skadden Arps | 1735 | $845–1150 | $1035 | $340–845 | $620 |
| Willkie Farr | 540 | $790–1090 | $950 | $350–790 | $580 |

It is significant that these are average partner rates since it is well known that partnership positions generally begin by the eighth year or so. Thus, it is reasonable to assume that the foregoing average rates certainly apply to 20 year attorneys who are partners in these firms.

48.    I have spent the time I have validating the adjustment factor used because, in analyzing the rates, I have used the adjusted rate, not the awarded or listed rate, to compare to the requested rates in the fee application. It is not a valid comparison to take a fee from five years ago for a 20 year lawyer, for example, and compare it to a fee for a 20 year lawyer today because it does not account for the change in rates in today's legal dollars. (Nor, if it is for the same lawyer, does it take account of the fact that the lawyer is now five years more experienced than when the prior rate was awarded.)

49.    The adjustment factor is merely a tool to approximate what the current rate for an attorney of the same years of experience would be awarded now, as opposed to when the award was actually made. Because the adjustment factor does not take into account the increased years of experience between a previous fee award and the attorney's current experience, it does not account for increased experience and expertise gained in intervening years. Thus, it is to be expected that the current rate for attorneys who have received previous awards will be meaningfully above the adjusted rate based on a prior award.

50.    The years of practice for an attorney are based on either information directly provided by the source or, where it was not so provided, by checking the attorney's website or the California State Bar Member Search. In some cases, the

28

year of admission to the Bar may not be completely reliable because there may be reasons that an attorney's years of admission to the California State Bar are less than the years of practice. For example, admission may be delayed by the Bar's check on an attorney, or may have delayed taking the California Bar or have first practiced in a different state. Where the attorney graduated from a California law school, it is likely that s/he graduated the same year as the Bar admission. I have identified those lawyers who are listed as SuperLawyers because it is one measure of an attorney's skill, experience and reputation. It is reasonable to conclude that an attorney who is listed as a SuperLawyer should be on the very high end of rates for attorneys of their years of experience, especially since, as the chart shows, comparable rates have been awarded or listed by attorneys of the same years of experience who are not identified as SuperLawyers. The determination of whether someone is a SuperLawyer is based on a check of a member of my staff under my direction in January 2014.

## IV.   RATES AWARDED OR PAID IN OTHER CASES

51.    As the exhibits accompanying my declaration reflect, fee awards for attorneys handling complex civil rights cases in Los Angeles vary by years of experience. For example, my most recent awarded rate was $975 per hour (*Rodriguez et al. v. County of Los Angeles et al.,* CV 10-6342-CBM (AJWx) (12/27/2014); a 28-year attorney in my office was awarded $775 in that same case. See Exhibit 34 to Exhibit B to this Declaration. To illustrate the reasonableness of the requested rates in this case, I excerpt from Exhibit B relevant awarded and other rates for attorneys in the 50-33 year experience range. The first table is for statutory fee awards or lodestar cross-checks in civil rights class actions.

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | | |
|---|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** | **Super-Lawyer** |
| Sid Wolinsky[13] | DRA* | 51 (1961) | $860 | 2012 | $946 | |
| Sid Wolinsky[4] | DRA* | 49 (1961) | $835 | 2010 | $979 | |
| Sandy Rosen[10] | Rosen Bien & Galvan | 48 (1962) | $800 | 2010 | $938 | |
| Barrett S. Litt[34] | Kaye, McLane, Bednarski & Litt | 45 (1969 | $975 | 2014 | $1006 | SL |
| Ian Herzog[24] | Law Office of Ian Herzog | 44 (1967) | $1,000 | 2011 | $1,104 | SL |
| Barrett S. Litt[8] | Litt, Estuar & Kitson | 43 (1969) | $850 | 2012 | $935 | SL |
| Barrett S. Litt[6] | Litt, Estuar & Kitson | 40 (1969) | $800 | 2009 | $973 | SL |
| Paul R. Fine[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 39 (1972) | $850 | 2011 | $965 | SL |
| Barrett S. Litt[15] | Litt, Estuar & Kitson | 39 (1969) | $750 | 2008 | $937 | SL |
| Dan Stormer[8] | HSKRR**** | 38 (1974) | $825 | 2012 | $907 | SL |
| Bill Lann Lee[18] | Lewis, Feinberg, Lee, Renaker, & Jackson | 38 (1974) | $825 | 2012 | $907 | SL |
| Barrett S. Litt[7] | Litt, Estuar & Kitson | 38 (1969) | $725 | 2007 | $935 | SL |
| Stephen Glick[24] | Law Offices of Stephen Glick | 37 (1974) | $800 | 2011 | $908 | SL |
| Mark Rosenbaum[2] | ACLU | 35 (1974) | $740 | 2009 | $896 | SL |

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | | | |
|---|---|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate | Super-Lawyer |
| Jose R. Allen[4] | Skadden Arps | 34 (1976) | $930 | 2010 | $1,057 | SL |
| Paul L. Hoffman[6] | Schonbrun, de Simone | 33 (1976) | $750 | 2009 | $912 | SL |

Table 1 shows adjusted rates of well over $900. These are all based on documented court awards in civil rights cases, and thus do not reflect commercial rates, which are generally higher. The awards for lawyers from large firms who received civil rights fee awards, although none are within the range of years of practice relevant here, consistently demonstrate that the awarded rates for such attorneys are significantly higher in adjusted dollars than those sought here when factoring in years of experience. For example, Angela Padilla, now a 15-year attorney, received $600 eight years ago in a civil rights case, which comes to $821 in adjusted dollars, and an unnamed Bingham McCutcheon attorney with 13 years' experience was awarded $665 in 2010, which comes to $766 in adjusted dollars. Lawrence Paradis from Disability Rights Advocates, then a 26-year attorney received $730 in 2010, which amounts to $854 in adjusted dollars; in 2013, Mr. Paradis was awarded $800 (based on 2012 rates when he was a 27-year attorney), which comes to $865 in adjusted dollars.

Because it would consume an undue amount of space to list the cases, rate sources and other information relied upon in the body of this Declaration, I do not list them in the Declaration for any of the tables. Pages 16-21 of Exhibit B contain the full name of each reference used, and the source referred to, by superscript number. (For example, using the reference from Table 1 to Lawrence Paradis, superscript #13 refers to the Fee award in *Communities Actively Living*

*Independent and Free v. City of Los Angeles*, 2:090cv-00287 CBM-RZ-Doc # 255
(C.D. Cal. 6/10/13) (lodestar award in settlement of ADA injunctive relief class
action), the citation to which may be found at page 17 of Exhibit B.)

The next table is for consumer class action lodestar crosschecks.

| Table 2: Consumer/Wage & Hour Class Action Lodestar Crosschecks [Rate by Years of Practice] | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Patrick N. Keegan[53] | Keegan & Baker LLP | 20 (1993) | $695 | 2013 | $722.80 |
| Guy Wallace[51] | Schneider Wallace | 17 (1993) | $650 | 2010 | $760 |
| Jonathan Selbin[57] | Lieff Cabraser | 16 [1993] | $600 | 2009 | $730 |
| Eric Gibbs[55] | Girard Gibbs | 15 (1995) | $675 | 2010 | $789.65 |
| Eric Gibbs[56] | Girard Gibbs | 15 (1995) | $675 | 2010 | $789.65 |

Table 2 shows consumer class action attorneys with 14-20 years of
experience, receiving over $700 in adjusted dollars (and in some cases nearly
$800). These are attorneys whose maximum experience was 20 years. Generally
speaking a consumer class action is not more complex, and often may be less
complex, than a complex civil rights case.

The third table shows commercial rates that I have gathered.

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | | |
|---|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Grad/ Yrs** | **Rate** | **Year** | **Adjusted Rate** | **Super-Lawyer** |
| Thomas J. Nolan[82] | Skadden Arps | 40 (1971) | $1095 | 2011 | $1,231 | SL |
| Unnamed[92] | Davis, Polk | 23 (1986) | $960 | 2009 | $1,168 | |

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | | |
|---|---|---|---|---|---|---|
| Atty | Firm | Practice Grad/ Yrs | Rate | Year | Adjusted Rate | Super- Lawyer |
| Unnamed[92] | Davis, Polk | 19 (1990) | $955 | 2009 | $1,162 | |
| Jason D. Russell[82] | Skadden Arps | 18 (1993) | $1030 | 2011 | $1,158 | SL |
| Daniel Perry[93] | Milbank, Tweed | 14 (2000) | $1135 | 2014 | $1135 | SL RS |
| Marc Becker[81] | Quinn Emanuel | 24 (1988) | $1035 | 2012 | $1,119 | N/A |
| Wayne Barsky[86] | Gibson Dunn | 26 (1983) | $905 | 2009 | $1,101 | |
| Unnamed[91] | Paul Hastings | 36 (1974) | $940 | 2010 | $1,099 | |
| Unnamed[85] | Paul Hastings | 33 (1978) | $940 | 2011 | $1,057 | N/A |
| Gordon Kirscher[90] | O'Melveny &Myers | 38 (1971) | $860 | 2009 | $1,046 | |
| Unnamed[92] | O'Melveny & Myers | 34 (1975) | $860 | 2009 | $1,046 | |
| Unnamed[92] | Klee, Tuchin | 19 (1990) | $850 | 2009 | $1,034 | |
| Daniel Kolkey[86] | Gibson Dunn | 32 (1977) | $840 | 2009 | $1,022 | |
| Arturo Gonzalez[83] | MoFo | 28 (1985) | $950 | 2013 | $988 | SL |
| Brian J. Hennigan[89] | Irell & Manella | 25 (1983) | $775 | 2008 | $980 | SL |
| Unnamed[92] | Weil, Gotscahl | 23 (1986) | $799 | 2009 | $972 | |
| Unnamed[92] | Gibson Dunn | 25 (1974) | $790 | 2009 | $961 | |
| Unnamed[85] | Paul Hastings | 23 (1998) | $850 | 2011 | $956 | N/A |
| Marcellus McRae[86] | Gibson Dunn | 21 (1988) | $785 | 2009 | $955 | |
| Alejandro Mayorkas[90] | O'Melveny &Myers | 23 (1986) | $770 | 2009 | $937 | |
| Unnamed[92] | Hennigan, Bennett | 30 (1979) | $760 | 2009 | $925 | |
| Delilah Vinzon[93] | Milbank, Tweed | 12 (2002) | $900 | 2014 | $900 | |

Table 3 shows attorneys in commercial cases where the adjusted rate is $900 or more. Using adjusted rates, attorneys with as few as 14 years' experience have rates exceeding $1000; all but one of the attorneys listed in Table 1 above have less years of practice than Ms. Sobel's 37 years, and reflect rates far in excess of those being sought here. The rates on this Table exceed $900 in adjusted rates. It is well established that civil rights rates were intended by Congress to be comparable to complex commercial litigation such as antitrust. *See, e.g., Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1122-23 (C.D. Cal. 2008) ("declarations establish that the hourly rates set are similar to those for attorneys of comparable skill and experience at the rates paid for complex federal litigation, which was Congress' intent for civil rights cases. *See City of Riverside v. Rivera*, 477 U.S. 561, 575-576, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (quoting Senate Report, at 6, U.S.Code Cong. & Admin. News 1976, p. 5913, supra, ('Congress intended civil rights fees to be comparable to that for 'other types of equally complex Federal litigation, such as antitrust cases')")). There is nothing to suggest that the legal work involved in the rates referenced in Table 3 is more complex than a complex civil rights case.

52.    Exhibit B to my Declaration also supports a substantial fee for paralegals and law students (also referred to as law clerks). The primary paralegal being billed is Julia White from my office; she has over 25 years' experience, and was last awarded a rate of $280 (in *Rodriguez*, cited previously). A billing rate of $225 or more is well supported by cases and the practice in private firms.

## V.    STANDARD BILLING PRACTICES

53.    I have worked regularly over the years with all the firms seeking compensation in this case. For all billers in my office, there is and always has been a standard record keeping procedure to account for time. All billers keep track of their time contemporaneously, and they enter it directly into the billing

34

program. Similarly, I know because of my ongoing relationships with the other attorneys on this case, and reviewing fee motions that we have filed together, that they follow similar practices.

54.     Because of my experience and specialization in public interest and civil rights litigation, I am especially familiar with the availability of attorneys in the Southern California area to handle complex civil rights class actions. Relatively few lawyers are available or willing to undertake such matters. It is the expectation in such cases that, if successful as here, counsel will receive an enhancement beyond their current billing rate. As explained previously, the fee requested here does not result in an enhancement. However, this expectation reinforces the reasonableness of the fee Plaintiffs' counsel seek here.

## VI.   COSTS NORMALLY BILLED TO THE CLIENT

55.     In connection with my own practice of law in Los Angeles, and in investigating the practice of law firms in the Los Angeles area regarding standard billing practices, I have determined that it is the routine and common practice of firms handling complex litigation to charge fee-paying clients separately for copying, facsimile, long distance telephone charges, transportation and travel costs including airfare, car rental, parking and mileage, postal charges, overnight courier and messenger fees, fees for service of process and attorney service, court filing fees, computerized legal and database research, deposition transcripts and court reporter fees, witness fees, expert or consultant fees and other necessary out-of-pocket expenses. In both contingent fee retainers, and on the rare occasions that this office does retained civil rights cases, all of these are defined as costs for which the client is responsible to reimburse separately from the attorneys' and other billers' charges for their time. With the exception of expert fees, which are not recoverable under the relevant federal or state statutes here, reimbursement of all such costs is requested.

56.     The table below reflects the costs each firm seeks in this case, exclusive of payment to the class administrator, the final amount for which will be reflected in the proposed Final Approval Order, and which are being paid directly by Defendants as a credit against the class fund. Mr. Hoffman's firm does not seek any fees. The costs listed below were provided to me by each firm. They total $5608.93.

| Hadsell & Stormer Costs | |
|---|---|
| **Description** | **Amount** |
| Word processing | 1,060.50 |
| Monthly Supplies | 126.00 |
| Monthly Telephone | 105.00 |
| Litigation Files | 95.00 |
| Manila Folders | 4.50 |
| Lexis Research | 38.91 |
| Index/Exhibit tabs | 7.50 |
| Postage | 0.46 |
| Scanning | 28.50 |
| Photocopying | 1,038.90 |
| Mileage/Parking | 21.75 |
| Medical Records | 15.00 |
| Conference Calls | 67.20 |
| **Total Costs** | **2,615.72** |

| Kaye, McLane, Bednarski & Litt Costs | |
|---|---|
| **Description** | **Amount** |
| E106-Research | $950.38 |
| E107-Delivery | $283.38 |
| E134-Parking | $18.00 |
| E145-PrintAudit | $432.15 |
| **Total:** | **$1,683.91** |

| Sobel Costs | |
|---|---|
| **Description** | **Amount** |
| Fed Ex | $71.42 |

36

| Filing Fee | 350 |
|---|---|
| Messenger/Atty Service | 607.96 |
| Postage | 9.92 |
| Printing | 104.1 |
| Parking | 56 |
| External Hard drive to Ds | 109.9 |
| **Total** | **$1,309.30** |

## VII.   CLAIMS AND OPT OUTS TO DATE

57.   As of June 4, 2015, there have been 70 claims received by the Class Administrator, no objections, and two opt outs. One opt out was based on a pending individual suit filed by the class member, and the other indicated that the person felt that there were more important things to do with the money than give it to him. No one expressed dissatisfaction with the settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5, 2015 in Pasadena, California.

Barrett S. Litt