UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHERYL AICHELE, ET AL., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants. | Case No.: CV 12-10863-DMG (FFMx) <br><br> **ORDER GRANTING FINAL APPROVAL OF AWARD OF ATTORNEYS' FEES AND COSTS [193]** |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................... 1

II. DESCRIPTION OF PLAINTIFFS' CLAIMS ............................................ 2

III. ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD. .................................................................. 3

IV. THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS REASONABLE ........................................................................................... 8

V. CONCLUSION ..................................................................................... 133

## I. INTRODUCTION

Class Counsel seek an award of $668,750 (25% of the total class fund), plus costs of $5608.93 (exclusive of class administration costs), out of a total Class Fund of $2,675,000, to be paid separately from payments made to class members pursuant to the provisions of the settlement agreement. The settlement agreement provides as follows regarding money distributions to class members, subject to the final approval of the Court:

(a) Each class member who files a timely, valid claim shall be allocated four points. This covers claims for the arrest and conditions on the bus.[1]

(b) Each class member who files a timely, valid claim who qualifies as a member of the Vicinity Sub-Class (people arrested in the area but not on City Hall lawn either because they were not involved or followed police directions to remove themselves and were nonetheless arrested) shall be allocated an additional four points.

(c) Each class member who files a timely, valid claim who qualifies as a member of the OR Sub-Class and spent 36 hours or less in custody (measured from the time of arrest) shall be allocated an additional two points.

(d) Each class member who files a timely, valid claim who qualifies as a member of the OR Sub-Class and spent more than 36 hours in custody shall be allocated an additional four points.

(e) No class member who files a timely, valid claim shall receive less than $4,000. If, and to the extent necessary, the distribution formula will be adjusted so that all members who are allocated four points will receive $4,000, the remaining funds will be distributed pro rata even if that

---

[1] The Court certified various sub-classes, including arrest, bus conditions, vicinity arrests and failure to provide release on OR. Because the settlement does not precisely track the sub-classes, the Court does not discuss them in this Order.

        means the class members receiving four points end up receiving more per point than other class members.

  (f) Each Named Plaintiff shall receive the amount due to him or her under the foregoing formula, plus a $5,000 Class Representative Payment for their special contributions to the case as Named Plaintiffs.

## II. DESCRIPTION OF PLAINTIFFS' CLAIMS

Beginning October 1, 2011, peaceful protestors – one of many "Occupy" gatherings around the country – first assembled on the south lawn at City Hall. The details of Plaintiffs' allegations contained in the Complaint and various filings and will not be repeated here. The claims involved allegations that Defendants unlawfully engaged in actions in violation of class members' constitutional rights, including arresting then unlawfully, holding them for extended periods on buses transporting class members to jail where the conditions of confinement were unlawful, and unlawfully denying release on their own recognizance ("OR") to most class members.

The instant lawsuit was filed on December 12, 2012. Extensive investigation was done both before and after the filing of the lawsuit to gather information to support the claims. In addition, discovery was conducted after the lawsuit was filed. Highly contested motions to certify the class as to both the City and the County occurred, including the filing of a motion to certify, separate oppositions by both the City and County, separate reply briefs regarding each, and a hearing.[2] After extensive mediation efforts, the foregoing settlement was reached. Pursuant to that agreement and the Class Notice, Plaintiffs have limited their fee request to 25% of the Class Fund, plus costs.

---

[2] The County's role in the case was limited to providing deputies on LASD buses. It was not involved in the arrests or in the OR decisions. Thus, its share of the settlement is limited.

2

## III. ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD

Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar. *See, e.g., In re Heritage Bond Litigation,* 2005 WL 1594403 at 18*; In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 973-74 (N.D.Cal.2001). Because this provides a useful framework for analyzing the appropriate fee award here, the Court will employ that framework in analyzing the requested fee.

### A. THE COMPLEXITY OF THE ISSUES AND THE RISK OF NON-PAYMENT

Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. §1988) was enacted in 1976. The legislative history states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011, 1976 U.S.Code Cong. & Admin.News at 5913.

#### 1. *The Legal Issues Are Complex And Unsettled.*

The issues in this case address complex issues of constitutional law. The legality of the arrests involved complex and largely uncharted First Amendment questions. Similarly, there is no law addressing the standards for OR release under Penal Code §853.6. The claims of tight handcuffing and other conditions on the bus were likely subject to a "conditions of confinement" standard of proof, which includes a state of mind element that would likely be challenged on the basis that Defendants faced an extraordinary situation requiring extraordinary measures. The only relatively straightforward claim was the Vicinity sub-class (regarding which there was the potential for considerable factual dispute).

3

### 2. *Class Actions Are Inherently Risky.*

There are substantial risks in any class action. Most cases filed as a class action are not certified and many that are can still result in a loss, or in only partial success. Thus, there is an added level of risk in any class action. *See* Litt Dec. ¶¶14 to 30.

### 3. *The Management of the Case was Challenging.*

Although this was not a case that required extensive database management, a significant portion of the class membership in the case did not have stable addresses. Plaintiffs' counsel placed a high priority on maintaining contact with a large number of class members throughout the case, including monitoring and communicating on Occupy-related websites or other social media. As a result, although Plaintiffs' counsel ultimately fell short of their goal of reaching 90% of class members, most class members did receive notice, and 182 timely claims were filed. (*See* Gilardi Declaration that accompanied the proposed Final Approval Order.) This was a time intensive and laborious undertaking and, in addition to the Class Administrator. Plaintiffs' counsel engaged in active outreach. Further, Plaintiffs' counsel spent many hours collecting and analyzing the information regarding which class members fit into what sub-classes; this was important to both certifying the sub-classes and to analyzing during settlement discussions how a potential recovery would be distributed, and whether it would be adequate.

### 4. *Reaching A Settlement Was Difficult.*

Plaintiffs' counsel gathered information regarding comparable settlements from all over the country, which was used in ultimately negotiating a settlement. While settlement was reached relatively early with the County after the grant of class certification, there were several delays regarding the City. For a long time, it was uncertain whether or not the City case would settle. There were several mediation sessions and, at the conclusion of the process, there was a mediator's proposal with the deadline to respond being extended several times at the City's

request. Thus, until the very conclusion, the outcome of mediation with the City was uncertain, and took approximately a year to resolve.

### B. THE RISKS OF NON-PAYMENT WERE SUBSTANTIAL

There was substantial risk of non-payment facing Plaintiffs' counsel. While the County had the resources to pay a judgment, the risk lay in establishing that the underlying conduct was illegal. This was discussed in the previous section, and will not be repeated here. Seeking seven figure amounts of money from government entities always carries risks of politics entering into the equation.

Even though settlement was reached with a relatively small amount of litigation, the 25% fee Plaintiffs are requesting will not fully cover their lodestar, much less any risk enhancement. The lodestar is as low as it is only because Plaintiffs' counsel are experienced in litigation of this type. Without such expertise, it is likely that the hours other counsel, even those experienced in civil rights litigation, would expend to accomplish the same result would substantially increase. Further, much of the preliminary work done to gather the relevant facts occurred pro bono during the initial arrest and release process, and is not included in the lodestar although counsel could have reasonably contended that it should be.

Finally, civil rights cases such as this face particular challenges for class action practitioners that are not present in other class litigation because policy or custom must be proven under *Monell*, and some deference is given to police in adopting appropriate tactics.

### C. THE EFFORT EXPENDED BY COUNSEL.

Including the investigation time, counsel litigated this case for nearly three years, excluding time spent on the initial arrests. The work performed included: 1) investigation of the underlying circumstances, including communicating directly with many class members; 2) preparation of the complaint and amended complaint; 3) the Rule 26 conference and report; 4) analysis of documents from a variety of sources, including public materials on the internet and from City Council files, documents obtained through a Freedom of Information Act request filed by the

5

Partnership for Civil Justice, and social media; 5) a successful contested motion to certify the classes; 6) preparation of a mediation brief and multiple mediation sessions; 7) negotiation and preparation of extensive settlement documents, including settlement agreement, preliminary approval order, class notice and claim forms; 8) ongoing work with the Class Administrator; 9) the proposed Final Approval Order, and this Order; 10) Final Approval Hearing; and 11) continuing contact with class members offering information and assistance as requested. That description does not capture the full extent of the effort because, unlike many class actions, there was considerable individualized contact and communication with individual class members.

In addition, two interveners opposed the class action and took their claims to the Ninth Circuit.

### D. THE RESULT OBTAINED FOR THE CLASS

This case was hard fought, as already described. The class members are people of little means. All work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered into only after Plaintiffs won class certification. Even then it required approximately a year of settlement efforts.

The financial terms of the settlement are very favorable to class members. Every class member receives no less than $4000. Those who were bystanders and were arrested, or were held without OR – which is most class members – receive substantially more with a maximum possible recovery of over $10,000. These amounts are exclusive of attorneys' fees and costs.

The settlement compares well with other protest cases. The most comparable case is one involving arrests of people involved in protests over the shooting of Oscar Grant in Oakland, California. Participating class members in Oakland, who were arrested and held for 14 to 24 hours before being released in circumstances similar to the class here, received an average of approximately $4200. See Doc. #188 (Declaration of Carol A. Sobel). Here the average (referring to the mean)

recovery, based on the 182 claims filed and determined to be valid in this case, well exceeds $10,000. See Doc. # 188, *supra*, for elaboration regarding other protests and similar settlements.

### E. COUNSEL'S EXPERIENCE

Class Counsel are highly experienced litigators in the fields of civil rights and class actions. The Court is familiar with all of them. All of the appointed class counsel are well-known and highly regarded civil rights lawyers, and all have extensive experience dealing both with civil rights and class action litigation. In addition, they are experienced in the area of protest civil rights class actions and other law enforcement class actions. In support of the class certification motion, extensive information regarding the qualifications of all class counsel was submitted to the Court, which demonstrated the exceptional qualifications of class counsel in this case. *See* Doc. ## 63, 64 and 65 (Sobel Declaration and CV, Litt Declaration with Litt and Hoffman CVs, and Stormer Declaration with list of awards attached).

### F. COUNSEL'S SKILL

This issue has been answered by the discussion above. There can be little doubt that counsel in this case are highly skilled attorneys in the field of civil rights and civil rights class actions, particularly law enforcement class actions. The Court is in a position to assess for itself the skill level of Plaintiffs' counsel.

### G. THE REACTION OF THE CLASS

As the Final Order Approving Class Action Settlement explains, there were no objections, and a total of four opt-outs. Further details regarding the opt-outs can be found in the discussion of opt-outs in the Final Approval Order. As discussed in that Order, the reaction of the class supports approval of the settlement and it similarly supports the requested award of attorney's fees.

## IV. THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS REASONABLE

In this case, Class Counsel seek an award of $687,500, plus costs. Costs are relatively modest, totaling under $30,000 including class administrator costs. The costs sought by Plaintiffs' counsel as reimbursement totals only $5,608.93. It is well established in the Ninth Circuit that, while the court has discretion to use either a percentage of the fund or a lodestar approach in compensating class counsel (*see, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295 (9th Cir. 1994), the percentage of the fund is the typical method of calculating class fund fees. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("the primary basis of the fee award remains the percentage method"). While most circuits leave the method used to the discretion of the trial court, "[m]ost federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes." *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F. Supp. 2d 732, 748 (S.D.Tex. 2008).

### A. THE PERCENTAGE OF THE FUND METHOD OF CALCULATING FEES IS THE COMMON METHOD TO CALCULATE FEES AND SUPPORTS THE FEE REQUEST HERE.

Class action litigation is risky by its very nature. In a Federal Judicial Center 1996 report, titled "Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules" ("FJC Report"), the Report authors studied the outcomes of four federal districts and concluded that 31.7% or less of the filed class cases resulted in successful class outcomes for Plaintiffs. This does not account for the degree of success (i.e., some cases could have resulted in minimal or partial success, and they would still be in the successful claim category). Thus, an outcome such as that obtained in this case is the exception, not the rule. The FJC Report also examined the awarded fees and

8

concluded that "attorneys' fees were generally in the traditional range of approximately one-third of the total settlement."

Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner. *See, e.g., Vizcaino*, 290 F.3d at 1050 ("lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee, since the lodestar method does not reward early settlement."); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1266-67 & n.3, 1271 (D.C.Cir.1993) (noting that the lodestar approach "encourages significant elements of inefficiency" by giving attorneys an "incentive to spend as many hours as possible" and "a strong incentive against early settlement"; the percentage approach "more accurately reflects the economics of litigation practice"; "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it influence the fee award"; accordingly, "we join the Third Circuit Task Force and the Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534 (1998) (the percentage approach avoids numerous drawbacks of the lodestar approach and is preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class. Hence, under the percentage approach, the class members and the class counsel have the same interest -- maximizing the recovery of the class.").

While the Ninth Circuit has set a benchmark of 25% as a percentage of the fund (*see Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311

(9th Cir.1990) (establishing benchmark percentage of 25% of the fund as normal class counsel percentage of fund award)), this is an across-the-board benchmark, which is often adjusted upward or downward depending upon the assessment of the results, and the size of the fund. In megafund cases, fees more commonly will be under the 25% benchmark in this Circuit. *See generally* Appendix in *Vizcaino*, 290 F3d 1043 (providing fees in megafund cases between $50 million - $100 million). In contrast, in cases under $10 million, the awards more frequently will exceed the 25% benchmark, and indeed go above 30%. *See Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 297 (N.D.Cal. 1995) ("the cases…in which high percentages such as 30-50 percent of the fund were awarded involved relatively smaller funds of less than $10 million"). Even in the cases cited in the *Vizcaino* Appendix, which are all megafund cases where the recovery exceeds $50 million, half the cases resulted in a fee of 25% or more including *Vizcaino* itself, where the fee was 28% of a $97 million fund, with a multiplier of 3.65.

It is well recognized that attorneys' fees should be aligned with those of the class, which is best accomplished by awarding a percentage of the fund in the normal contingent fee range. In this way, class counsel has an interest in maximizing the recovery because a greater recovery directly benefits counsel as well as the class. In defining a "reasonable fee" in representative actions, the law should "mimic the market." *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) ("When a fee is set by a court rather than by contract, the object is to set it at a level that will approximate what the market would set. . . . The judge, in other words, is trying to mimic the market in legal services."). Attorneys "regularly contract for contingent fees between 30% and 40%." *In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, 16 (D.N.J. 2005)(citing cases), making the requested fee highly reasonable in relation to the market for contingent fees.

The percentage figure here compares favorably with the general percentage of recovery awarded in cases around the country. *See* Silber and Goodrich, *supra*

10

(summarizing available data and recommending that a 33% of the fund fee award is both reasonable, and in line with the general market for contingent fee work); *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 303 (3d Cir. 2005), citing three studies ("[O]ne study of securities class action settlements over $10 million . . . found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period . . . found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million . . . found recoveries in the 25-30% range were 'fairly standard.'") (citations omitted).

The 25% of the fund that Plaintiffs' counsel are requesting puts the fee request here at the lower end of settlements under $10 million. Further supporting the requested award is that none of the warning signs for a settlement that may be influenced by improper favorable treatment of class counsel exists here. The class was certified through a contested motion, not by agreement. Class counsel are not receiving a disproportionate distribution of the settlement, the payment of fees is not separated from the class funds and therefore counsel cannot receive excessive fees in exchange for an unfair class settlement, and fees not awarded do not revert to defendants. *See, e.g., In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946-947 (9th Cir. 2011). Nor is this a settlement where portions of the class fund revert to Defendants, and result in a highly disproportionate fee in relation to the actual (as opposed to theoretical) monetary recovery of the class. *See, e.g., Allen v. Bedolla*, __ F.3d __, 2015 WL 3461537 (9th Cir. June 2, 2015).

**B.    A LODESTAR CROSS-CHECK SUPPORTS THE FEE REQUESTED HERE.**

A lodestar cross-check is not required in this circuit and, in a case such as this, may not be a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc.*, 2007 WL 221862, 16 (N.D. Cal. 2007) (no lodestar cross-check required where an early settlement resulted in exceptional results for the class even though some class members and the New York attorney general objected to the 25% of the fund request as excessive). Nonetheless, the Court has reviewed the

information provided and engaged in a limited lodestar cross-check. *See. e.g.,
Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-04149 MMM SHX, 2008
WL 8150856, at *9 (C.D. Cal. July 21, 2008) ("In contrast to the use of the lodestar
method as a primary tool for setting a fee award, the lodestar cross-check can be
performed with a less exhaustive cataloging and review of counsel's hours"
[citations omitted]; relying on sworn statements of qualified attorneys regarding the
hours reasonably expended and their customary billing rates).

     The Court follows that approach here. Class Counsel seek a fee award of
$687,500, plus an additional $5,608.93 for litigation costs.

     The estimated total attorney hours in the case through Final Approval of the
settlement is 1050 hours or more. There also will be approximately 85 paralegal
hours. *See* Declaration of Barrett S. Litt, ¶¶31-33, filed in support of fee motion.
The average (mean) attorney lodestar rate based on the requested award of 25% of
the class fund is approximately $630 per hour. The great bulk of the attorney time
was expended by the four appointed class counsel (Sobel, Litt, Stormer, and
Hoffman) because the nature of the work required their direct participation. Even
on the one contested motion – the class certification motion, on which Mr. Litt did
much of the work – it was most cost effective for him to do that work because of
his experience in that area and prior briefings on similar issues.

     The four class counsel did over 70% of the attorney work on the case among
them. Their average (mean) billing rate exceeds $900 per hour. *See* Litt
Declaration addressing awards, based on current billing rates, of $875-$1000 per
hour for attorneys of the experience, skill, and reputation of appointed class
counsel. If this were a regular statutory fee motion seeking a lodestar award, the
average rate of all attorneys who worked on the case would exceed $760 per hour
(calculated by multiplying the hours and current rate for each attorney, totaling
them, and then dividing that total by the number of attorney hours to get an average
hourly rate). *Id*. at ¶35. The award Plaintiffs' counsel are seeking (25% of the

12

fund), however, yields an average hourly attorney rate of approximately $630, almost a 20% discount. *Id*. at ¶¶47-52.

Thus, the requested fee, which yields less than the lodestar and seeks no multiplier, is reasonable. Whether measured by the percentage of the fund standard or the lodestar standard, the requested fees are reasonable.

## V.     CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for attorneys' fees and costs, and awards Class Fund attorneys' fees and costs in the amount of $687,500 and $5608.93, respectively.

IT IS SO ORDERED.

DATED: September 9, 2015

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

13